Richard **DUHAIME**; James W. Yoder; Donna M. Yoder; Theodore A. Peck; John Sullivan; and Clarissa Sullivan, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY; John Hancock Variable Life Insurance Company; and John Hancock Distributors, Inc., Defendants.**

Civ. A. No. 96–10706–GAO.

United States District Court, D. Massachusetts.

Dec. 31, 1997.

& Wentz, P.S.C., Covington, KY, Stephen Hubbard, Cantilo, Maisel & Hubbard, L.L.P., Dallas, TX, for Richard Duhaime, Maureen Hahn, Theodore A. Peck, John Sullivan and Clarissa Sullivan.

John G. Fabiano, Jeffrey B. Rudman, Hale & Dorr, Boston, MA, Edwin G. Schallert, Debevoise & Plimpton, New York, NY, for John Hancock Mutual Life Insurance Company, John Hancock Variable Life Insurance Company and John Hancock Distributors, Inc.

Kashele Ebron, Curtiss Ebron, Bridgeport, CT, J. Allen Holland, Jr., John R. Cavanaugh, Lynch, Brewer, Hoffman & Sands, Boston MA, Diane A. Nygaard, Overland Park, KS, for Kashele Ebron, Curtiss Ebron, Katherine Rose, Richard Beauvais, Phyllis Beauvais, Timothy Murphy, Delores Goldberg and Bruce R. Tremmel.

Paul D. Gifford, Atty. Gen., Oakland, CA, Joseph B. Lichtblau, Boston, MA, for California Insurance Commissioner and Texas Plaintiffs.

Douglas Stevick, Brian Wolfman, Public Citizen Litigation Group, Washington, DC, for Howard M. Metzenbaum.

Glen DeValerio, Michael G. Lange, Berman, DeValerio & Pease, Boston, MA, Keith M. Fleischman, Melvyn I. Weiss, Barry A. Weprin, Brad N. Friedman, Milberg, Weiss, Bershad, Specthrie & Lerach, New York, NY, Douglas M. Brooks, David Pastor, Kenneth G. Gilman, Gilman & Pastor, Boston, MA, John J. Stoia, Jr., Andrew W. Hutton, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, John K. Grant, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, Andrew S. Friedman, Sullivan Bunch H., Bonnett Fairbourn, Friedman & Balint, P.C., Phoenix, AZ, Lawrence D. Shubow, Boston, MA, Joseph D. Ament, Michael B. Hyman, William H. London, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, Chicago, IL, W. Christian Hoyer, Tampa, FL, Ronald R. Parry, Arnzen, Parry

## MEMORANDUM

O'TOOLE, District Judge.

Before the Court is the proposed settlement agreement between the plaintiff class and defendants John Hancock Mutual Life Insurance Company, John Hancock Variable Life Insurance Company, and John Hancock Distributors, Inc. (collectively "John Hancock" or "Hancock"). The plaintiffs seek certification of the class, and both parties seek approval of the settlement and dismissal of the claims against John Hancock pursuant to Fed.R.Civ.P. 23(e). For the following reasons, the class is certified and the settlement is approved.

TABLE OF CONTENTS

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

II. Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

III. Class Notice and Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

IV. Class Certification ............................................................. 62
 A. Rule 23(a) Requirements ................................................. 62
 1. Numerosity ......................................................... 62
 2. Commonality ....................................................... 62
 3. Typicality ......................................................... 63
 4. Adequacy of Representation ........................................ 63
 B. Rule 23(b)(3) .......................................................... 64
 1. Predominance ...................................................... 64
 2. Class Action is Superior .......................................... 64

V. Settlement ................................................................... 65
 A. Terms of the Settlement ................................................ 65
 B. Fairness and Adequacy of the Settlement ............................... 67
 1. Procedural Considerations ......................................... 67
 (a) Stage of Discovery ............................................ 67
 (b) Arm's Length Negotiations ..................................... 68
 (c) Attorneys' Fees Negotiated After Settlement ................... 68
 2. Substantive Fairness .............................................. 68
 (a) Likelihood of success on the merits compared to the amount and
 form of relief offered by the settlement ..................... 68
 (b) The major causes of action addressed in the settlement and their
 relationship to relief granted ............................... 69
 (c) Treatment of different segments of the class ................. 70
 (d) Response of Neutral Third Parties ............................ 70
 C. Objections to the Settlement ........................................... 71
 1. Objections that the settlement does not sufficiently "punish" John
 Hancock ............................................................ 71
 2. Objections to the nature of General Policy Relief ................. 71
 3. Objections to the ADR Process ..................................... 72
 4. Objections to the adequacy of the settlements benefits in general .. 72
 5. Objections that the process of settlement negotiation itself was not
 fair ............................................................... 72

VI. Conclusion ................................................................. 72

## I. Background

The plaintiffs Richard Duhaime, Maureen Hahn, Theodore A. Peck, John Sullivan and Clarissa Sullivan originally filed this class action on September 20, 1995, in the United States District Court for the Middle District of Florida as *Duhaime, et al. v. John Hancock Mutual Life Ins. Co., et al.*, No. 95–1556–CIV–T–21A. The complaint challenged John Hancock's marketing, sales, and policy administration practices from early 1979 to the mid–1990's. According to the complaint, John Hancock marketed and sold life insurance products through deceptive and misleading sales practices, including: use of the "vanishing premium" concept, with the number of out-of-pocket premium payments a policyholder would have to make being mis-represented; use of the "retirement plan" or "investment plan" concept, by which insurance products were mischaracterized as a retirement plan or investment vehicle; and use of "churning" tactics, by which Hancock agents depleted the cash value of existing policies to pay for new ones. (Amended Compl. ¶¶ 52, 66, 74.)

The action was vigorously litigated by both sides. By a motion to dismiss filed in November 1995, John Hancock challenged the complaint on various grounds, including the statute of limitations, failure to state a claim, the parol evidence rule, the doctrine of merger, and the "economic loss doctrine." In December 1995, three months after the case began, plaintiffs moved to certify a nationwide class consisting of present and former Hancock policyholders. Before either mo-

tion was decided, in March 1996, the court in Florida transferred the action to this District over plaintiffs' opposition. *See* 28 U.S.C. § 1404.

After transfer, the parties resumed active litigation. On May 5, 1996, Hancock moved for a stay of all discovery until the Court had acted on the plaintiffs' class certification motion. This Court denied the stay and directed the parties to agree to a discovery schedule. Shortly thereafter, an initial settlement meeting was held on May 29, 1996. Negotiations continued for almost nine months while discovery continued. On February 12, 1997, plaintiffs and defendants executed a Memorandum of Understanding ("MOU"), setting forth the principal terms of a settlement agreement. (Weiss Aff. App. C.) The MOU was explicitly contingent on the outcome of additional discovery and the resolution of certain other issues. (Skrine Decl. ¶¶ 9, 11; Weiss Aff. ¶ 80.) As contemplated by the MOU, plaintiffs' counsel completed substantial additional discovery, including review of approximately 1.2 million documents produced by Hancock, as well as depositions and interviews of eighteen senior level Hancock employees. (Selwyn Aff. ¶¶ 5, 11; Weiss Aff. ¶¶ 53–55, 57, 59.)

On June 6, 1997, plaintiffs filed an Amended Complaint making allegations substantially similar to those made in the original complaint.[1] That same day the parties entered into a Stipulation of Settlement in which they agreed upon a settlement of the action subject to the Court's approval.

Pursuant to an order dated June 13, 1997, this Court gave preliminary certification of the class for settlement purposes, directed the issuance of notice of the proposed settlement to the class, and scheduled a "fairness hearing" for October 24, 1997. The Notice included a description of the litigation, the class, and the terms of the proposed settlement (including the relief available and the release to be given to Hancock). It also specified the date and location of the hearing

for final approval, the procedure and deadline for filing objections to the settlement and/or requests for exclusion from the class, the amount of attorneys' fees and costs that were sought by class counsel, and a toll-free telephone number that class members could call for more information about the settlement.

The parties mailed the notice to 3.8 million class members and published a summary notice in sixty eight newspapers (with a combined circulation in excess of 21.9 million), as well as on John Hancock's Internet Web site. (Cordingley Decl. ¶ 29; Berman Decl. ¶¶ 5, 8.)

The deadline for postmarking exclusion requests was October 3, 1997. As of October 16, 1997, 4,404 requests for exclusion had been received. (Cordingley Supp. Decl. ¶ 8.) These requests, which relate to 6,009 policies, represent approximately 0.16% of the 3.8 million policies in the class. (Cordingley Supp. Decl. ¶ 8.) In addition to exclusion requests, fifty-three objections were timely submitted from the beneficiaries of 137 policies.

As a result of these objections, and of discussions with various state regulatory authorities, several amendments were made to the stipulation of settlement in mid-October. All these changes benefitted class members; they were primarily addressed to the form of the final notice.

The "fairness hearing" was held on October 24th for the purpose of determining whether the class should be finally certified, whether the settlement should be approved as fair, reasonable, and adequate, and whether the application of plaintiffs' counsel for an award of attorneys' fees and expenses should be approved. At the hearing the Court heard from the proponents of the settlement, as well as counsel for the class and the defendants. The Court also heard from the following objectors: class members Katherine Rose, Richard Beauvais, Phyllis Beau-

---

1. The original complaint, filed September 20, 1995, contained nine counts: (1) Violations of Section 10(b) of the Exchange Act and Rule 10b–5 Promulgated Thereunder; (2) Violations of Section 10(b) and Rule 10b–16 (extension of loans without written statements disclosing the conditions of the loans on quarterly statements); (3) breach of fiduciary duty; (4) negligent misrepresentation; (5) fraudulent inducement; (6) common law fraudulent concealment and deceit;

(7) reckless, wanton and/or negligent supervision; (8) breach of duty of good faith and fair dealing; (9) breach of contract. The Amended Complaint, filed June 6, 1997, contains the same allegations. The primary difference between the two Complaints is that in the Amended Complaint the Class is expanded, from policyholders who bought policies through June 30, 1995, to those who have ownership interests in policies up through December 31, 1996.

vais, Timothy Murphy, and Delores Goldberg (hereinafter referred to as the "Rose Plaintiffs") through their attorney Diane A. Nygaard; class member Senator Howard Metzenbaum through his attorney Douglas Stevick of the Public Citizen Litigation Group; class member Bruce Tremmel; and class member Thomas Olick. Prior to the hearing, the Court reviewed and considered all written objections that had been submitted.

## II. Subject Matter Jurisdiction

This Court has subject matter jurisdiction of this class action. First, the plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78f(a)) and under Rule 10b–5 (17 C.F.R. § 240.10b–5), provide a basis of federal jurisdiction as to which there is no requirement for a minimum amount in controversy. 15 U.S.C. § 78aa; 28 U.S.C. § 1331; see Nottingham Partners v. Trans–Lux Corp., 925 F.2d 29, 33 (1st Cir.1991) (recognizing that federal courts have exclusive jurisdiction over claimed violations of the Securities Exchange Act of 1934).

With federal question jurisdiction established, the Court has supplemental jurisdiction over the plaintiffs' state law claims under 28 U.S.C. § 1367. See, Vera–Lozano v. International Broadcasting, 50 F.3d 67, 70 (1st Cir.1995)("a federal court may exercise supplemental jurisdiction over a state claim whenever it is joined with a federal claim and the two claims 'derive from a common nucleus of operative fact' ").

■ Additionally, the court may take jurisdiction over pendent parties as well as pendent claims. 28 U.S.C. § 1367 ("Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."). See also 13B Charles Alan Wright et al., Federal Practice and Procedure: Jurisdiction § 3567.2 (2d ed. 1984 & Supp.1997) ("The principal purpose of the statute is to make it clear that in federal-question cases pendent-party jurisdiction is permissible.").

Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332. First, complete diversity exists between the named plaintiffs and John Hancock. In a class action, § 1332's requirement of complete diversity applies only to the named plaintiffs and the named defendants. Snyder v. Harris, 394 U.S. 332, 340, 89 S.Ct. 1053, 1058–59, 22 L.Ed.2d 319 (1969). Second, each of the named plaintiffs have alleged damages in excess of the $50,000 amount in controversy requirement that was effective at the time the original pleadings were filed. With diversity jurisdiction established among the named parties, subject matter jurisdiction extends to the balance of the class under 28 U.S.C. § 1367. See In re Abbott Laboratories, 51 F.3d 524 (5th Cir.1995)(holding that supplemental jurisdiction over unnamed members of the class was authorized even though they did not each meet the amount in controversy requirement).

## III. Class Notice and Personal Jurisdiction

■ The court has personal jurisdiction over the class members because they have been afforded, through adequate notice, the right to exclude themselves from the Class. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811–12, 105 S.Ct. 2965, 2974–75, 86 L.Ed.2d 628 (1985). The constitutional concern regarding a federal court's exercise of personal jurisdiction over an absent out-of-state class member who does not have minimum contacts with the forum is addressed by the requirements of Rule 23(c)(2):

In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

Fed.R.Civ.P. 23(c)(2).

■ In addition, Rule 23(e) holds that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." The nature and extent of Rule 23(e) class notice of a proposed settlement lies within

the discretion of the trial judge. *See Zimmer Paper Prods. v. Berger & Montague*, 758 F.2d 86, 90 (3d Cir.1985) (observing that Rule 23(e) commits the form of the notice to the courts discretion); *Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 527 (D.N.J.1997). In this case, the Court approved a combined notice—to provide notice of the class action as required by Rule 23(c)(2) and to provide notice of the terms of the settlement as required by Rule 23(e).

In order to ensure that the notice was received by class members, approximately 3.8 million copies of the approved notice were mailed by first-class mail to current and former policy owners. In addition, a summary notice was published in three national newspapers and in the newspapers with the largest circulation in each of the fifty states and the District of Columbia. (Cordingley Decl. ¶ 8; Parker Decl. ¶ 7.) Through September 30, 1997, parties remailed notice packages that had been returned with a forwarding address. If no forwarding address was provided by the United States Post Office, a search firm was retained to provide updated address information, and if that information was available, notice was remailed. (Cordingley Decl. ¶¶ 10, 12–13; Parker Decl. ¶ 8; Cordingley Supp. Decl. ¶¶ 15–18.)

Not only must notice be disseminated to the greatest practical extent, it must also be understandable and complete. "[T]he essential purpose of the [class] notice, ... [is] to fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them." *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir.1974)(finding that notice of settlement was adequate when it announced the date of the settlement hearing, outlined the allegations prompting the litigation, and summarized the settlement terms). This Court carefully reviewed the content of the notice and concludes that both the individual and published notices provided class members the information necessary to make an informed and intelligent decision about whether to participate in the class or whether to object to the proposed settlement. The notice advised class members of the allegations in the amended complaint, the terms of the proposed settlement, the steps required for exclusion from the class or objection to the proposed settlement, and the scheduled fairness hearing. Consistent with this Court's June 13, 1997 Order, the notice was accompanied by a cover letter summarizing the notice. In addition, as also approved by the Court, a "plain English" question-and-answer brochure responding to anticipated questions about the action and the proposed settlement was included. (Cordingley Decl. ¶ 7; Parker Decl. ¶ 5.) Finally, each mailing included a statement of eligibility setting out the relief that the policyowner would be eligible to receive in connection with each policy he or she owned. (Cordingley Decl. ¶ 7; Parker Decl. ¶ 5.)

In reviewing the clarity of the notice, the Court has considered the opinions of the experts who reviewed it. (*See* Weisberg Decl. ¶ 10 (concluding that the notice materials meet "the key criteria of plain English for lay readers" and "demand no more of their lay readers than the minimum necessary to understand the legal situation in which the class action places them and the choices they must now make in connection with it"); Thompson Decl. ¶¶ 8–9 (concluding that "fairly and objectively set forth information on the benefits and options available to Class Members pursuant to the proposed settlement")).

Moreover, in accordance with the settlement agreement, the parties have made efforts to ensure that the notice is not only understandable, but actually understood. John Hancock has established a toll-free number telephone bank to receive and respond to policyowner inquiries regarding the action and the proposed settlement. (Cordingley Decl. ¶ 15.) The toll-free number, which was included in the class notice as well as in the published summary notice, has been operational since June 23, 1997. (Cordingley Decl. ¶ 15.) The telephone bank is staffed with individuals who were trained by representatives of both plaintiffs and John Hancock to answer policyowner questions. Both John Hancock and the plaintiffs have had representatives present at the phone bank for supervision and monitoring purposes since it became operational. As of September 9, 1997, the phone bank had received and responded to over 107,185 policyowner inquiries. (Cordingley Decl. ¶ 28.)

In addition, the stipulation of settlement provides for a post-settlement notice to be sent after approval of the settlement which further advises class members regarding their options under the settlement, and thereafter a "post card" notice to remind members to choose relief under the settlement agreement. (*See* Stipulation of Settlement Exs. H, I, and J.)

The settlement agreement has been amended in some respects since the notice of the settlement was mailed to class members. All amendments enhance the relief available to the plaintiffs—some amendments affect the substance of the relief itself, creating more protections for class members who submit their claims to the Alternate Dispute Resolution ("ADR") process and some amendments change the content of the second notice to be sent to class members, clarifying the options available to them. (*See* Amended Stipulation of Settlement at 15.) The parties will be directed to provide notice to all policyowners who requested exclusion from the class advising them that the agreement has been amended to provide enhanced relief and these policyowners will have an opportunity to rejoin the class. This requirement will be incorporated into the final order.

## IV. Class Certification

■ Before addressing the substantive fairness, adequacy, and reasonableness of the settlement, the Court must finally certify the class, which was conditionally certified in the June 13, 1997 Order. That Order relied in part upon the finding that one of the common questions which "predominated" over individual ones was the question of "whether the proposed settlement is fair, reasonable and adequate." (June 13, 1997, Order ¶ 2(b).) The Supreme Court has since held that a settlement's fairness is not properly considered in the predominance inquiry, but rather that inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem Prods. v. Windsor,* — U.S. —, —, 117 S.Ct. 2231, 2236, 138 L.Ed.2d 689 (1997).

The Supreme Court in *Amchem* also emphasized that the class certification requirements of Rule 23 "demand undiluted, even heightened, attention in settlement context," because they are "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem,* — U.S. at —, —, 117 S.Ct. at 2231, 2248. Therefore, the question of certification must be revisited. Having reconsidered the matter, this Court remains convinced that the class in this instance is properly certified.

The class to be certified is a Rule 23(b)(3) "opt-out" class which consists of persons or entities who have or had an ownership interest in one or more of the approximately 3.8 million whole life, universal life, variable life insurance policies and/or certain fixed or variable annuities and/or certain mutual fund shares issued by John Hancock during the period from January 1, 1979 through December 31, 1996, but not including persons or entities with an ownership interest in group life insurance policies or certain corporate-sponsored policies. (Stipulation of Settlement ¶¶ 17, 19.) This class must meet the requirements of Federal Rules 23(a) and 23(b)(3).

### A. Rule 23(a) Requirements

Under Fed.R.Civ.P. 23(a), all federal class actions must meet four threshold requirements: numerosity, commonality, typicality, and adequacy of representation.[2]

■ *1. Numerosity.* The proposed class must be so numerous that "joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). To meet this requirement, the class representatives need only show that it is difficult or inconvenient to join all the members of the class. *See, e.g., Gorsey v. I.M. Simon & Co.,* 121 F.R.D. 135, 138 (D.Mass.1988)(joinder of group of 800–900 would be impracticable). Here, the class consists of persons or entities who have or had an ownership interest in one or more of approximately 3.8 million policies. The threshold for a presumption of impracticality of joinder is thus easily crossed in this case. (*See also,* Tribe Aff. ¶ 15; Miller Aff. ¶ 10.)

---

**2.** The Rule provides:

One or more members of a class may sue or be sued as the representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

2. *Commonality.* In order to maintain a class action, there must be "questions of law or fact common to the class." Fed. R.Civ.P. 23(a)(2). This commonality requirement is a "low hurdle" easily surmounted. *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 185 (N.D.Ill.1992). Indeed, it requires only that "resolution of the common questions affect all or a substantial number of the class members." *Jenkins v. Raymark Indus.,* 782 F.2d 468, 472 (5th Cir.1986). The requirement is satisfied in this case by the allegation that the defendants engaged in "uniformly deceptive and misleading sales practices." (Amended Compl. ¶ 42.) In an opt-out class such as this one, the commonality requirement is subsumed by the predominance requirement contained in Rule 23(b)(3), *Amchem,* —— U.S. at ——, 117 S.Ct. at 2243, and the issue will be discussed more fully in that context.

3. *Typicality.* The typicality analysis focuses on whether the named plaintiffs' "claims arise from the same course of conduct that gave rise to the claims of the absent [class] members." *Burstein v. Applied Extrusion Technologies, Inc.,* 153 F.R.D. 488, 491 (D.Mass.1994); *see also Adair v. Sorenson,* 134 F.R.D. 13, 17 (D.Mass.1991).

Here, the complaint alleges that Richard Duhaime purchased a policy from John Hancock's agents in 1981 after being shown an illustration in which premiums were paid only during the first thirteen years of the policy, but that Mr. Duhaime was subsequently billed by Hancock for premiums after the thirteenth year (the Vanishing Premium allegation). (Amended Compl. ¶¶ 26, 90–93.) The Yoders allege that they purchased a "Flex–V" plan from a Hancock agent who represented it as a retirement plan, when in fact it was a life insurance policy, and that they subsequently had to pay charges greatly in excess of what had been represented by the agent. (Amended Compl. ¶¶ 27, 94–99.) Theodore Peck alleges that a John Hancock agent sold him insurance policies by assuring him that those new policies would "not cost him anything" because the premiums would be paid from the accumulated dividends of his existing policies, he subsequently discovered that loans had been taken against those polices that reduced the amount payable to

his beneficiary. (Amended Compl. ¶¶ 28, 100–05.) John and Clarissa Sullivan allege that Hancock, without their knowledge or authorization, repeatedly caused loans and withdrawals to be drawn against their policies for the purposes of paying premiums, fees, and purchasing shares in Hancock insurance and investment products. (Amended Compl. ¶¶ 29, 106–13.)

Because the named plaintiffs were subjected to the same deceptive sales techniques allegedly used by John Hancock against other class members, their claims are typical of the class claims. (*See* Miller Decl. ¶ 13; *see also* Priest Aff. ¶ 18; Tribe Aff. ¶¶ 21–24.)

4. *Adequacy of Representation.* "[T]he representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This inquiry focuses on both the adequacy of the named plaintiffs and the adequacy of class counsel. *Amchem,* —— U.S. at —— & n. 20, 117 S.Ct. at 2251 & n. 20.

With regard to the named plaintiffs, the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* —— U.S. at ——, 117 S.Ct. at 2251. *See also General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157–58, n. 13, 102 S.Ct. 2364, 2370–71, n. 13, 72 L.Ed.2d 740 (1982). As such, it often overlaps with the typicality question. *East Texas Motor Freight Sys. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896–97, 52 L.Ed.2d 453 (1977). In this case, the injuries alleged by plaintiffs are the same as those that the class is alleged to have suffered.

Unlike the class in *Amchem,* in which there were conflicts between class members with present injuries and class members with possible future injuries, here all class members are alleged to have been injured during the same period of time. Moreover, in this case all the class members were harmed in approximately the same way. This pecuniary harm is readily quantifiable. The Court can discern no significant potential conflicts like those present in *Amchem,* where class members had suffered injury which manifested in many different ways. (*See* Issacharoff Decl. ¶ 14.) As a result, there are no significant divisions in this class similar to the ones

in *Amchem.* (*See* Sexton Aff. ¶ 31 ("[a]ll class members share a common interest in establishing the existence of the alleged common course of conduct and their respective damages, which all flow from similar injuries and can be objectively quantified"); Tribe Aff. ¶ 27 (named plaintiffs "have the same legal claims as the class, they claim to have been victimized by the same allegedly nationally-directed schemes of misrepresentation, they have allegedly been subjected to the same mass-produced and allegedly misleading sales materials and they have the same interest in prompt compensation for their claimed injuries")).

With regard to the adequacy of class counsel, the Court finds that counsel are able and experienced, and have served as competent, thorough, and rigorous advocates for the interests of the class.

### B. Rule 23(b)(3)

In addition to the Rule 23(a) prerequisites, the class must satisfy two additional requirements: (1) the questions of law or fact common to the members of the class must predominate over any questions affecting only individual members; and (2) a class action must be superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3).

*1. Predominance.* The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem*, —— U.S. at ——, 117 S.Ct. at 2236. It necessarily centers on the claims alleged in the complaint, as opposed to the settlement, and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, —— U.S. at ——, 117 S.Ct. at 2249. In *Amchem*, predominance was defeated because the claims of various class members arose out of different exposures to asbestos, under fundamentally disparate state law, and from different kinds of individual harm.

The predominance requirement is often "readily met" in "cases alleging consumer or securities fraud." *Amchem*, —— U.S. at ——, 117 S.Ct. at 2250. While the resolution of common questions need not dispose of the entire action, "common issues are predominant only if their resolution would 'provide a definite signal of the beginning of

the end.'" *Mattoon v. City of Pittsfield*, 128 F.R.D. 17, 20 (D.Mass.1989) (citing *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 41 (D.N.H. 1983)). In this case, plaintiffs argue that allegations of a common scheme of deception establish predominance even though the scheme might be implemented in large part through oral misrepresentations. Here plaintiffs allege that they and other class members were fraudulently induced to purchase John Hancock products pursuant to a common scheme developed by the defendants and effectuated through their nationwide training program for sales agents. The complaint alleges that John Hancock provided deceptive sales materials and policy illustrations to its agents, facilitating the deceptive sales practices. (Amended Compl. ¶¶ 5–21, 42, 48.) Because these allegations describe a nationwide course of conduct, differences in oral sales presentations do not defeat predominance. *See In re American Continental Corp./Lincoln Sav. and Loan Securities Litig.*, 140 F.R.D. 425, 427 (D.Ariz.1992)(finding that although not identical, alleged oral misrepresentations to bond purchasers were sufficiently uniform to warrant class treatment of securities fraud suit; common sales approach was conceived by management and communicated to bond sales representatives with expectations that it would be conveyed to prospective purchasers); *In re Baldwin–United Corp. Litig.*, 122 F.R.D. 424, 427 (S.D.N.Y.1986)("The wrongful conduct alleged by plaintiffs occurred at the management level ... and manifested itself in the defendants' course of promoting and selling [the product] .... Even proof of a material variance among the representations will not defeat the class if certain omissions, inferred from their absence in the [sales] literature, were common to all.").

Insofar as the class members assert claims for fraud or misrepresentation under various state laws, the differences among these laws do not appear to be so great as to undermine the predominance of the common questions of law or fact. (*See* Issacharoff Decl. ¶¶ 20–23 & App. B.) *See also In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.1986).

*2. Class Action is Superior.* Rule 23(b)(3) requires that class resolution be "su-

perior to other available methods for the fair and efficient adjudication of the controversy." This provision is intended to permit class actions that would "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, —— U.S. at ——, 117 S.Ct. at 2246. There are four factors a court must consider in making a finding that a class action would be superior:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3).

■■■ The general interest class members might have in individually conducting separate lawsuits does not require denial of class certification when, as a practical matter, a large number of the claims of class members would be so small as to make it unlikely that claimants would bring actions on their own. *See, e.g., Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 171 (D.Mass.1989); *Randle v. Spectran*, 129 F.R.D. 386, 393 (D.Mass.1988). *See also Amchem*, —— U.S. at ——, 117 S.Ct. at 2242 (recognizing benefit of class action mechanism in negative value cases); *Shutts*, 472 U.S. at 809, 105 S.Ct. at 2973 ("Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually."). In this case, the damage claims of most individual class members would be relatively small compared to the cost of litigation, leaving individual class members with little incentive to litigate their own claims. This circumstance makes a class action superior to the impractical prospect of individual actions.

Furthermore, it is desirable to concentrate the claims in a single forum. This forum is appropriate, since the defendants' principal place of business is located within this district.

■■■ With regard to manageability, the Supreme Court in *Amchem* held that when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial." *Amchem*, —— U.S. at ——, 117 S.Ct. at 2248. Accordingly, the Court need not consider the issue at this time and makes no ruling with regard to the manageability of the proposed class.

In sum, the requirements of Rule 23 are met, and the class is certified.

## V. Settlement

### A. Terms of the Settlement

The Stipulation of Settlement provides for two types of relief to be made available to all class members: Individualized Relief through ADR, and General Policy Relief ("GPR").

The ADR [3] process is a two-tier process. In the first instance, class members who believe they have been defrauded may submit claims for review by John Hancock teams which will score those claims according to an established set of guidelines as provided for in the settlement agreement. (Amended Stipulation of Settlement at 15–33.) A claimant who is dissatisfied with the outcome of the initial review has the right to appeal to a panel of independent arbitrators who, using the same scoring and relief criteria, will review the claim *de novo*.

In order to guide a claimant through this process, the class counsel will designate a Policyowner Representative to monitor the entire process and to serve as an advocate for claimants. Additionally, certain class members who purchased specific types of policies or who purchased policies pursuant

---

**3.** The ADR process is fully explained at pages 15–33 of the Amended Stipulation of Settlement, and accompanying exhibits.

to certain sales concepts will be entitled to automatic relief, and in cases where there is proof of particularly gross misconduct, claimants are entitled to enhancements to the relief awarded. The relief available under the ADR process is tailored to the nature of the claim and the level of proof established. Under the ADR process, claims are categorized according to the theories of recovery described in the Amended Complaint: (1) "Churning," (2) "Retirement," (3) "Vanishing Premium" or "Limited Premium Payment," and (4) "Other Claims" (generally covering post-sale conduct such as forgery and misappropriation). Relief is granted according to the kind of claim asserted and the score received. For example, if a "retirement" claimant receives a score of three in the ADR process, John Hancock will rescind the policy and contribute into either mutual funds or annuities—the kinds of policies that a "retirement" claimant may have thought she was getting in the first place.

There is no limit to the aggregate amount of relief that the class may obtain through the ADR process. There is no "cap" on the maximum payment that can be made, nor is there any predetermined "fund" to be allocated among successful claimants. John Hancock will be obliged to pay the full measure of prescribed relief to each successful claimant, without regard to the total number of successful claims.

A class member who chooses not to submit a claim to the ADR process may elect GPR, without submitting either a claim form or any supporting evidence.[4] Under this form of relief, John Hancock will make contributions to existing policies, extend loans to class members at special interest rates for the purpose of making out-of-pocket premium payments, or allow class members to purchase enhanced value policies, enhanced value annuities, or mutual fund enhancements.[5]

In addition, certain class members are eligible for Monthly Deduction Relief ("MDR"), regardless of whether they elect GPR, the ADR process, or neither. This relief will have an aggregate value of $4 million and will be divided equally among all eligible polices.[6] Class Members with in-force policies will receive one-time contributions to their policies; Class Members with terminated policies will receive cash payments. (Amended Stipulation of Settlement at 51.)

In exchange for this relief in its various forms, the class members relinquish all claims against John Hancock relating to transactions with John Hancock during the class period.[7]

4. General Policy Relief ("GPR") is outlined in pages 31–55 of the Stipulation of Settlement. There are five types of GPR: Dividend and Interest Contributions (contributions by John Hancock to policy values for in-force policyowners over a period of up to four years), Optional Premium Loans (special interest rate loans to be used solely to pay all or part of a specified number of annual premiums), Enhanced Value Policies (an opportunity to purchase a life insurance policy that is enhanced with contributions from John Hancock), Enhanced Value Annuities (an opportunity to purchase a non-qualified, single premium deferred annuity with a financial contribution by John Hancock and reduced surrender charges for older annuitants), and Mutual Fund Enhancement (an opportunity to purchase Class A shares in certain mutual funds without a front- or back-end load).

5. An eligible Class Member will be able to designate anyone in whom he or she has an insurable interest as eligible to purchase on of the enhanced products. With respect to this aspect of relief, the Court finds that, by virtue of its approval of the terms and conditions of the settlement, to the extent the opportunity to designate

another to receive a benefit under the settlement constitutes the offer or sale of a security under the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., the designation will be exempt from registration under the 1933 Act pursuant to section 3(a)(10) of the Act, which exempts securities "issued in exchange for one or more bona fide ... claims." 15 U.S.C. § 77c(a)(10).

6. Eligible Class members are: (1) Class Members who have or had an ownership interest in those Flex V variable life policies issued prior to February 1, 1994, which paid increased monthly charges due to the Deferred Acquisition Cost ("DAC") tax during the period from February 1, 1994 through December 31, 1996; and (ii) to Class Members who have or had an ownership interest in tax qualified universal life policies with respect to which interest credits were reduced during the period from January 1, 1992 through December 31, 1996.

7. The exact terms of the release are set forth in Part XIII of the Stipulation of Settlement, and the release was mailed to Class Members as part of the Notice Packet, App. A.

B. Fairness and Adequacy of the Settlement

 In order to approve the settlement, the Court is obliged to conduct an independent evaluation of its adequacy and fairness. In making this fairness determination, a district court is not an umpire as in a typical adversary litigation but rather "a guardian for class members who have not received notice or who lack intellectual or financial resources to press objections." *Weinberger v. Kendrick*, 698 F.2d 61, 69 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In this role, federal courts have generally considered a variety of factors that may be divided into two categories: (1) those considerations addressing the fairness of the process by which the settlement was negotiated; and (2) those considerations bearing on the substantive fairness of the settlement.

*1. Procedural Considerations.* Settlement of a large nationwide class action does not afford the same procedural safeguards to absent members of a class that full litigation of the same action would. Among other things, the opportunity and potential incentive for collusion between class counsel and the defendants is greater in the case of a negotiated settlement. For this reason, a court must carefully scrutinize the process by which the entire action was litigated and the settlement negotiated. Assurance that the process of negotiation was sufficient—that counsel was vigorously advocating on behalf of the class throughout settlement negotiations—is the best means of ensuring that the outcome is substantively fair to the class.

 The first step in assessing the procedural fairness of the negotiations is to ensure that the class has properly been certified and that adequate notice has been given. These prerequisites have been satisfied, as previously discussed. Other factors which bear on the procedural fairness of settlement negotiations include the state of discovery, whether negotiations were arm's length, and whether the attorneys' fees were negotiated after and separate from the proposed settlement. *See, e.g., M. Berenson Co. v. Faneuil Hall Marketplace*, 671 F.Supp. 819, 822 (D.Mass.1987).

(a) *Stage of Discovery.* "The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Board of School Directors of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980). Merits discovery in this case began in May 1996 and continued well into the spring of 1997, concurrent with the settlement negotiations. (Selwyn Aff. ¶ 4.) By the end of plaintiffs' discovery, John Hancock had produced approximately 3.75 million pages of documents, numerous reels of microfilm and videotapes and a variety of electronic media obtained from sources throughout the home office (including off-site storage facilities) and from twenty-two field offices in fourteen states. (Selwyn Aff. ¶¶ 5, 9.) This discovery covered all substantive issues raised by the complaint.

The plaintiffs' counsel also deposed fourteen John Hancock witnesses and interviewed two former employees prior to the completion of settlement negotiations. (Selwyn Aff. ¶ 11.) The individuals deposed and interviewed included employees of various levels of responsibility—persons who collectively are familiar with the John Hancock's products, distribution channels, sales and marketing activities, policy performance factor setting practices, customer complaint resolution procedure and other relevant matters.

 This discovery was sufficient to permit a reliable assessment of each parties' strengths and weaknesses. *Weinberger*, 698 F.2d at 74. Indeed, far less discovery has been deemed ample to support a settlement. *See, e.g., In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir.1981) (no formal discovery taken but access to other information such as indictments, documents produced to Grand Jury, and pleadings deemed adequate); *Greenspun*, 492 F.2d at 378 (two depositions taken).

Additionally, all class members were given full access to plaintiffs' discovery, and no class member who reviewed the discovery objected on these grounds. (*See* Weiss Supp. Aff. ¶ 16.)

*(b) Arm's Length Negotiations.* A second factor in evaluating whether the process of settlement was fair is whether there is evidence of arm's length negotiation. *See, Berenson,* 671 F.Supp. at 822. The history of the litigation makes clear that this settlement was the product of such negotiations. Preliminary discussions began in May 1996, but they did not lead to agreement until February 12, 1997, when the parties signed a MOU. (Skrine Decl. ¶ 11.) Both sides have offered evidence that virtually every term of the settlement agreement—including the scoring system, the scoring factors, the conclusive and rebuttable presumptions and the available remedies—was vigorously negotiated and revised as the settlement evolved. (*See* Skrine Decl. ¶¶ 5–6; Weiss Aff. ¶¶ 30–43.) There is no evidence that this settlement was collusive in any way.

*(c) Attorneys' Fees Negotiated After Settlement.* Finally, only after the settlement was finalized was John Hancock's liability for attorneys' fees and expenses even discussed. There is no basis for a conclusion that the negotiations were influenced in any way by the question of attorneys' fees. (Skrine Decl. ¶ 12.)

*2. Substantive Fairness.* In general, a settlement arrived at after genuine arm's length bargaining may be presumed to be fair. "When sufficient discovery has been provided and the parties have bargained at arm's length, there is a presumption in favor of the settlement." *City Partnership Co. v. Atlantic Acquisition Ltd. Partnership,* 100 F.3d 1041, 1043 (1st Cir.1996). Nonetheless, the court has an obligation to consider the substantive fairness of the relief made available to settling class members, and this presumption will not stand if the court determines that the substance of the agreement is not in fact fair and adequate.

In evaluating the substantive fairness of a class action settlement, the court cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim. Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation. As the Court of Appeals has observed:

> [A]ny settlement is the result of a compromise—each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial.

*Greenspun,* 492 F.2d at 381 (1st Cir.1974)(*citing United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.,* 447 F.2d 647 (7th Cir.1971); *Florida Trailer and Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960)).

Additionally, it is important to remember that the proposed settlement provides class members with an unqualified right to exclude themselves from the effects of the settlement if they would prefer to litigate. With these considerations in mind, the Court has examined several factors relevant to an evaluation of the substantive fairness of the action, including the plaintiffs' likelihood of success on the merits; the major causes of action addressed in the settlement and their relationship to the relief granted, whether segments of the class are treated differently, the response of neutral third parties, and the response of the class.

*(a) Likelihood of success on the merits compared to the amount and form of relief offered by the settlement.* One factor to consider in weighing the fairness of the settlement is whether the plaintiffs' "likelihood of success on the merits" balances appropriately against "the amount and form of the relief offered in settlement." *See Santana v. Collazo,* 714 F.2d 1172, 1175 (1st Cir. 1983). Thus, in cases primarily seeking monetary relief, the "present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing," should be compared with the amount of the proposed settlement. *Manual for Complex Litigation, Third,* § 30.42 at 238 (1995).

In this case, plaintiffs would face substantial obstacles to success if litigation were to

proceed on the merits as either a class action or as individual actions. In its motion to dismiss, John Hancock challenged the complaint on a variety of grounds, arguing, among other things, that the plaintiffs' claims of misrepresentations were contradicted by the language of the policies themselves; that promises of future conduct or expressions of opinions could not form the basis of a misrepresentation claim as alleged; that general allegations of a relationship or trust and confidence would not be enough to demonstrate a fiduciary duty or other duty to disclose; that the "economic loss doctrine" would bar the plaintiffs' tort claims; and that the breach of contract claims and misrepresentation claims would have to overcome the parol evidence rule. None of these defenses can be dismissed as patently insubstantial. The plaintiffs' recovery after trial is far from assured.

The settlement, on the other hand, provides class members with timely relief without having to risk the uncertainty of outcome, duration, and expense inherent in continuing the litigation. The settlement provides substantial benefits to all class members by providing them with the right to choose between two types of relief—the ADR process or GPR.

As the plaintiffs point out, the very availability of the ADR process provides each class member with a substantial benefit by ensuring access to a fair, simple, and essentially cost-free mechanism for resolving all claims regarding their policies that arose during the class period. A Policyowner Representative designated by the plaintiffs' counsel will serve as an advocate at no cost to the claimant. Under the scoring and relief guidelines agreed to by the parties, claimants will be able to obtain relief even where they may not be able to prove all of the legal elements of a particular claim or where that claim might otherwise be barred by a defense such as the statute of limitations or the parol evidence rule. The ADR process thus creates opportunities for relief and recovery that may be superior to those which would otherwise be available through litigation outside the ADR process. For example, one of the defendants' experts has estimated that an illustrative John Hancock policyowner (a 45–year–old male with a $50,000 policy) who obtains the highest score on a "vanishing premium" paid-up claim could receive an award worth $11,657; on an investment claim, $6,636; and on a replacement claim, $4,542.

*(b) The major causes of action addressed in the settlement and their relationship to relief granted.* Another way to evaluate the substantive fairness of a settlement is to consider "whether the major causes of action in the complaint are addressed in the settlement." *Berenson,* 671 F.Supp. at 823 (citing *Manual for Complex Litigation, Second,* § 30.41 at 237 (1985)). In this case, ADR, GPR and Monthly Deduction Relief ("MDR") are all tailored to the claims asserted in the complaint.

The ADR Process—which will be open to every class member—will provide successful claimants with valuable relief that corresponds directly to the harm demonstrated and that is equivalent to or greater than that which could be obtained through litigation. Under the ADR process, the guidelines for scoring claims are specifically designed to provide for a fair resolution of the three sales practices claims mentioned in the complaint—the "replacement claims," the "vanishing premium claims," and the "retirement/investment claims." For example, a claimant who demonstrates that he or she was guaranteed a death benefit in exchange for a fixed number of premiums may receive the Company's commitment to provide the coverage promised in exchange for the stated number of premiums. A claimant who demonstrates that he or she replaced an existing policy as a result of a misstatement may receive rescission of the new policy and reinstatement of the replaced policy. A claimant who demonstrates that he or she purchased a savings, investment or retirement plan without being adequately advised that the product being sold was in reality a life insurance policy may receive a transfer of the premiums paid on the policy, with interest, into either a single premium deferred annuity or Class A mutual fund shares with no sales load.

In addition, if a claimant meets certain objective criteria, he or she is entitled to an enhancement that can equal up to 300% of the estimated monetary value of the ADR award or the commission paid to the agent, whichever is greater. As one evaluator of the settlement has observed, these enhancements provide "an opportunity for claimants to receive recoveries that may be materially in excess of the damages that would otherwise be awarded to them in litigation in federal or state court." (Grundfest Aff. ¶ 18.)

Each of the benefits provided as GPR is likewise designed to address concerns raised by the circumstances described in the complaint: cash contributions and loans meet "vanishing premium" concerns; enhanced value policies and loans alleviate "churning" issues; and enhanced value annuities and mutual fund enhancement address investment issues. (*See also* Babbel Decl. ¶ 27)(the options provided to the class members "address the specific claims of harm alleged by the various class members in a flexible fashion"); (Gunter Aff. ¶ 11.)

■ *(c) Treatment of different segments of the class.* Another factor to consider in evaluating the substantive fairness of the class settlement is "whether segments of the class are treated differently in the settlement and to the extent that they are, the reasonableness of this different treatment … including whether the named plaintiffs benefit more or differently than the rest of the class." *Berenson,* 671 F.Supp. at 823. In this settlement, the segments of the class are treated differently only insofar as they elect to pursue different remedies. Far from being unfair, then, any differences in relief is the result of an attempt to be as equitable as possible in the distribution of relief. Any difference will be based upon real distinctions in the quantity, quality, and type of evidence presented in connection with their claims, and thus will not be unfair. *See, e.g., Securities and Exchange Commission v. Certain Unknown Purchasers,* 817 F.2d 1018, 1020–21 (2d Cir.1987)(affirming approval of securities class action settlement which provided individual compensation only to

class members with out-of-pocket losses), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988); *Spitz v. Connecticut Gen. Life Ins. Co.,* MDL No. 1136, Civ. No. CV958484, slip op. at 3 (C.D.Cal. Jan. 13, 1997); *Hammon v. Barry,* 752 F.Supp. 1087, 1094–95 (D.D.C.1990)(approving settlement over objections of class members who would receive no portion of the settlement fund due to the weaknesses of their claims).

Some objectors argued that the settlement treats poorer class members differently than richer class members, because poorer class members may not be able to avail themselves of certain types of GPR.[8] While that may be true to some degree, on the other hand the ADR process provides for substantial relief with no cash outlay by a claimant, which is a very favorable consideration for poorer claimants.

*(d) Response of Neutral Third Parties.* Throughout the settlement process, John Hancock has conferred with state regulators to ensure that the settlement did not violate any applicable state regulations. When the parties first presented the Stipulation of Settlement to the Court in June 1997, they informed the Court that John Hancock would be advising various state regulators that a settlement had been reached. Thereafter, John Hancock had extensive discussions with various states regulators, resulting in its agreeing to certain substantive enhancements to the proposed settlement. These enhancements have been incorporated into the Amended Stipulation of Settlement and will be available to all Class members.

Authorities from four of the states with whom John Hancock met regarding the terms of the settlement—the Massachusetts Office of the Attorney General, the Florida Department of Insurance, the New Jersey Department of Banking and Insurance Enforcement, and the Texas Department of Insurance—have all written to the Court expressing their view that the settlement is fair and supporting its approval. No state regulator has objected to the final Settlement Agreement. An objection that had been made by the California Insurance Commis-

---

8. *See, e.g.,* Objections of Anthony G. Fagen.

sioner was withdrawn after the settlement was amended to meet the objection.

■ The court considers the opinion of these state insurance regulators, who have evaluated the substance of the settlement from the public's perspective, to be a persuasive factor supporting the conclusion that the settlement is fair. *See Giusti–Bravo v. United States Veterans Admin.*, 853 F.Supp. 34, 36 (D.P.R.1993)(citing 2 H. Newberg, *Newberg on Class Actions* § 11.43 (1992)).

## C. Objections to the Settlement

In addition to conducting an independent evaluation of the settlement, the court must consider the number and substance of objections. *Hammon v. Barry*, 752 F.Supp. 1087, 1093 (D.D.C.1990); 2 H. Newberg, *Newberg on Class Actions* § 11.47 at 463 (2d ed.1985). In this case, after both mailed notice and published notice, only seventy-seven policy-owners timely objected (comprising .002% of the class) and only approximately 4,400 timely requests for exclusion were received from the owners of nearly 4 million policies. (Weiss Supp. Aff. ¶¶ 4–5.) Fifty-three timely written objections were submitted to the Court.[9] The Court has considered each objection—including two submissions (by the California Insurance Commissioner and by attorney Dennis Lyle, on behalf of his wife) that were subsequently withdrawn. The Court also heard oral presentations on behalf of some objectors at the October 24, 1997, fairness hearing.[10]

The substance of the objections falls into several categories: (1) objections that the settlement does not sufficiently "punish" John Hancock; (2) objections to the nature of GPR; (3) objections to the ADR process; (4) objections to the overall adequacy of the settlement's benefits; (5) objections to the process of negotiation; and (6) objections the amount of attorneys' fees requested. Each category of objections is addressed herein, except the question of attorneys' fees. Because these fees will not be paid out of a common fund, they do not have a direct effect on the fairness of the settlement itself. A separate memorandum addresses the award of attorneys' fees.

*1. Objections that the settlement does not sufficiently "punish" John Hancock.* Some objectors argued that the settlement was too favorable to John Hancock and did not sufficiently "punish" John Hancock for its wrongful practices. However, it is clear that John Hancock will be responsible for substantial aggregate payments under the settlement. First, the evidence is that the settlement will at a minimum cost John Hancock more than $74.1 million in cash payments and administrative costs. (Paster Decl. ¶ 4.) In addition, John Hancock will spend up to $4 million in policy credits and cash that will be made available through MDR. (Amended Settlement Stip. at 51.) Above these amounts will be the undetermined, and potentially very large, amount to be paid to claimants under the ADR process. This settlement is not painless to John Hancock.

More importantly, the value of a settlement should not be measured by its cost to the defendant, but by its benefit to the class. The fact that John Hancock is not "sufficiently punished" is not itself a reason for finding the settlement unfair. What is important is the nature of relief offered to the class. *See In re Prudential*, 962 F.Supp. at 557. As discussed above, the benefits to the class are substantial.

*2. Objections to the nature of General Policy Relief.* Many of the objectors argue that GPR offered is inadequate.[11] The simple answer to these objections is that GPR is not the only relief available. Class members

---

**9.** Some objectors were represented by the same attorney, and hence the difference between number of objectors and number of objections.

**10.** There was a small number of objections submitted after the October 3, 1997, deadline. Although these objections were untimely, it is worth noting that none of them raised any issue that was not already raised by other timely objections.

**11.** *See, e.g.*, the objections of Catherine H. Abraham (requesting policy rescission and full premium refund as option under GPR); Geoffrey M. Abraham (same); Thomas J. Crowley; Erio and Sara Gibertoni; Kenneth A. Gould; Bob Hatton Realty, Inc. Pension Plan; Elizabeth W. Hirsch; Paula C. Odierno; Patricia M. Owens; Vivian Peltier; and Diane M. Pietras.

have the opportunity to receive far greater relief if they submit to the ADR process. Those class members who will elect GPR will generally be those with claims that would be less likely to be successful in the ADR process.

Other objectors argue that GPR is a "marketing plan" which requires policyowners to buy more John Hancock products or to continue their existing relationship with John Hancock in order to receive the relief. Certainly, if GPR were the only type of relief available to the class, the fairness of the settlement would be questionable. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 802 (3d Cir.1995) (noting that "the fact that the settlement involves only non-cash relief ... is recognized as a prime indicator of suspect settlements"). However, because GPR is not the only alternative available to class members and because the ADR process provides for relief that does not require a claimant to purchase John Hancock products, and the evil that the Third Circuit pointed out in the *General Motors* litigation is not present here.

*3. Objections to the ADR Process.* Some class members have objected that the ADR process is too burdensome.[12] After consideration, the Court believes these objections to be without merit. The ADR process makes minimal demands on claimants and they pay none of the costs of the process. It is far less burdensome and time-consuming than any alternative kind of litigation would be.

*4. Objections to the adequacy of the settlements benefits in general.* Some class members would prefer larger cash payments or other forms of alternative relief, but this does not itself warrant disapproval of the settlement. The issue is whether the relief that the settlement does provide is adequate and reasonable. The fact that some might have preferred more lucrative relief does not control that question. A settlement is, after all, not full relief but an acceptable compromise.

*5. Objections that the process of settlement negotiation itself was not fair.* Other objectors have argued that plaintiffs did not undertake sufficient discovery, that the parties did not engage in arm's length settlement negotiations, or that the amount of the attorneys' fee request indicates that plaintiff's counsel was more interested in obtaining a large fee award than in achieving a fair settlement.[13] While the objectors rightfully point out that class action settlement negotiations are susceptible to these sorts of defects, there is no indication that the negotiations in this case were affected by them. Both plaintiffs and defendants offer testimony as to the contentiousness of the litigation prior to the settlement, as well as the difficulties involved in negotiating the settlement. From what appears, the negotiation process was genuinely arm's length.

The argument by some objectors that the proposed settlement is "virtually identical" to class-wide settlements in three other similar actions, suggesting that class counsel did not vigorously prosecute the claims or negotiate at arm's length, is persuasively refuted by the Weiss Affidavit and its appendices containing the ADR agreements in those other cases. A close examination of those other settlements indicates that while there are similarities between the settlement agreements, there are important differences as well. For example, the ADR process in this settlement is superior to that in the other cases.

In sum, the objections have all been considered, but none presents a persuasive reason for rejecting the settlement.

## VI. Conclusion

For all the foregoing reasons, the Court concludes that the class should be certified and the settlement approved. The Court will make an award of attorneys' fees in a separate opinion. An appropriate order accompanies this memorandum.

---

12. *See, e.g.,* Objections of the Rose Plaintiffs, objection of Diane M. Pietras, and objection of Arlene Stepnik.

13. *See* Objections of Theodore V. Duclos; Diane A. Nygaard (attorneys' fees the result of collusive settlement); Paula C. Odierno; Hart Sprager; Bruce R. Tremmel (alleges that he has documents that the plaintiffs should have considered).

## FINAL ORDER AND JUDGMENT

Based upon the submissions of the parties referenced above, and based upon this Court's Memorandum,

IT IS ORDERED, ADJUDGED AND DECREED:

1. This Final Order and Judgment incorporates herein and makes a part hereof (*i*) the Amended Stipulation of Settlement, dated October 23, 1997, (*ii*) Exhibit A (ADR Scoring and Relief Guidelines), Exhibit B (ADR Process Manual), Exhibit C (ADR Process Claim Form), Exhibit D (Simplified Underwriting Guidelines), Exhibit E (Class Notice, together with the accompanying cover letter, question-and-answer brochure and form of Statement of Eligibility), Exhibit F (Summary Notice), Exhibit G (Post–Settlement Notice), Exhibit H (form of Election Form), Exhibit I (Post–Settlement Summary Notice), and Exhibit J (Third Notice) and (*iii*) the Stipulation entered into by plaintiffs, defendants and Class Member Howard Metzenbaum ("Notice Stipulation"); *provided, however,* that the parties are hereby authorized to agree to and adopt such amendments to, and modifications and expansions of, the Amended Stipulation of Settlement and all exhibits thereto (the "Settlement Agreement")—including, without limitation, the Post–Settlement Notice materials and the ADR Process Manual—as (*a*) shall be consistent in all material respects with this Final Order and Judgment, and (*b*) do not limit the relief available under the Settlement Agreement.

2. Pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, a class for settlement purposes is hereby finally certified (the "Class") consisting of all persons or entities (the "Class Members") who had at any time during the period from January 1, 1979 through December 31, 1996 (the "Class Period"), an ownership interest in one or more whole life, universal life and/or variable life insurance policies (the "Policies") and/or fixed or variable annuities and/or mutual fund shares (which annuities and/or mutual fund shares were purchased with proceeds from the surrender of, a withdrawal of values from, or a loan against one or more Policy), including any rider issued in conjunction therewith and/or endorsement attached thereto, issued by the John Hancock Mutual Insurance Company, John Hancock Variable Life Insurance Company or John Hancock Distributors, Inc. (collectively, "John Hancock" or the "Company") in the United States during the Class Period, but excluding persons or entities (unless such persons or entities are Class Members by virtue of their ownership interest in other Policies) (*i*) who has or had an ownership interest in a group life insurance policy, (*ii*) who, represented by counsel, signed a document pursuant to a settlement of an actual or threatened lawsuit that releases the Company from any further claims concerning their Policy or Policies, (*iii*) who is any company that is or was the owner and the payor and the beneficiary of the same policy or (iv) who timely excluded him or herself from the Class pursuant to Section XI of the Amended Stipulation of Settlement and this Court's Order of June 13, 1997. A list of those persons who have excluded themselves from the Class, and who are therefore not bound by this Final Order and Judgment, has been filed jointly by the parties with the Court and is incorporated herein and made a part hereof. The parties shall cause notice, in a form to be approved by the Court, to be given to persons who have requested exclusion from the Class. To the extent any such persons shall determine to re-join the Class following such notice, they will be bound by this Final Order and Judgment, as described in paragraphs 6 and 7 below.

3. The terms and provisions of the Settlement Agreement, including all exhibits therein, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable, and adequate as to each of the parties and the Class Members; and the parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and pro visions (*provided, however,* that defendants, in consultation with Lead Counsel, are hereby authorized, without the approval of this Court, to implement the settlement prior to the Final Settlement Date, as defined in the Settlement Agreement).

4. The parties are hereby directed to mail and publish the Post–Settlement Notice materials in the form attached as Exhibits H and I to the Amended Stipulation of Settlement, as provided by the Settlement Agreement and further amended by the Notice Stipulation.

5. The terms of this Final Order and Judgment and of the Settlement Agreement, including all exhibits thereto, shall be forever binding on, and shall have *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings encompassed by the Release set forth in Section I of the Amended Stipulation of Settlement maintained by or on behalf of the plaintiffs and all other Class Members, as well as their heirs, executors and administrators, successors and assigns.

6. The following Release, which is set forth in Section I of the Amended Stipulation of Settlement, is expressly incorporated herein in all respects and is effective as of the date of this Final Order and Judgment:

I. *Definitions.* For purposes of this release and waiver ("Release"):

A. The term "Policies" means all whole life, universal life and/or variable life insurance policies and/or fixed or variable annuities and/or mutual fund shares issued by the Company during the period from January 1, 1979 through December 31, 1996 (which annuities or mutual fund shares were purchased with proceeds from the surrender or withdrawal of values from one or more life insurance Policies), including any paid-up additions or other riders or amendments to such policies, but not including any(*i*) group life insurance policies, (*ii*) policies, annuities and/or mutual funds owned by a person or entity who, represented by counsel, signed a document pursuant to a settlement of an actual or threatened lawsuit that releases the Company from any further claims concerning such product(s), (*iii*) policies, annuities and/or mutual funds with respect to which the owner has timely requested exclusion from the Class, or (*iv*) policies, annuities and/or mutual funds with respect to which a company is or was the owner and the payor and the beneficiary.

B. The term "Releasees" means the Defendants, their past, present and future parents, subsidiaries, affiliates, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, employees, general agents, agents, producers, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on the behalf or direction of any of them.

C. The term "Investment Plan" means a pension or retirement plan, investment or savings account, tuition-funding or mortgage-protection plan or other type of investment, savings or thrift vehicle.

D. The term "Released Transactions" means the marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, retention, administration, servicing or replacement (by means of surrender, partial surrender, loans respecting, withdrawal and/or termination of any life insurance policy) of (a) the Policies or (b) any policy, annuity or mutual fund issued by another company and terminated or sold in connection with the Policies. Such term shall include, without limitation, the matters described in Section II.A of this Release.

E. The term "Vanishing Premium" means (a) a concept under which an insurance policy's charges may be paid out of its then-current and accumulated values, as those charges become due, (b) a concept under which a single out-of-pocket premium payment or a fixed number of out-of-pocket premium payments—based on then-current, nonguaranteed assumptions about interest crediting rates and policy charges—may suffice to cover all policy charges in excess of interest credited and may keep coverage in

force throughout the insured's life, or for a specified period, without reducing the policy's death benefits, or (c) use of this term in connection with the sale of a Policy.

## II. *Release.*

A. Plaintiffs and all Class Members hereby expressly agree that they shall release and discharge the Releasees from, and shall not now or hereafter institute, maintain or assert against the Releasees, either directly or indirectly, derivatively, on their own behalf, on behalf of the Class or any other person or entity, any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights, including, without limitation, claims for all damages of any kind, including those in excess of actual damages, and claims for mental anguish, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be or could be alleged or asserted now or in the future by Plaintiffs or any Class Member against the Releasees or any of them in the Action or in any other court action or before any administrative body (including any state Department of Insurance or other regulatory entity or organization), tribunal, arbitration panel, or other adjudicatory body on the basis of, connected with, arising out of, or related to, in whole or in part, the Policies, the Released Transactions and servicing relating to the Released Transactions or Policies, including without limitation:

1. any or all of the acts, omissions, facts, matters, transactions, occurrences, or any oral or written statements or representations that were directly or indirectly alleged, asserted, described, set forth or referred to in the Action;

2. any or all of the acts, omissions, facts, matters, transactions, occurrences, or any oral or written statements or representations allegedly made in connection with or directly or indirectly relating to the Released Transactions, including without limitation any acts, omissions, facts,

matters, transactions, occurrences, or oral or written statements or representations relating to:

a. the Vanishing Premium concept;

b. the number of out-of-pocket payments that would need to be paid for a life insurance policy or the Policies;

c. the ability to keep or not to keep the Policy or the Policies in-force based on a fixed number and/or amount of premium payments (less than the number and/or amount of payments required by the terms of the Policies), and/or the amount that would be realized or paid under the Policies based on a fixed number and/or amount of cash payments (less than the number and/or amount of payments required by the terms of the Policies), whether in the form of (x) cash value and/or (y) death, retirement or periodic payment benefits and/or (z) Investment Plan-type benefits;

d. the interest rate credited or to be credited to premiums paid on the Policy or the Policies, or to amounts within the Policy or Policies, and the deductions (including all expense and other deductions) charged or to be charged against the Policy or Policies;

e. the nature, characteristics, terms, appropriateness, suitability, descriptions and operation of the Policies;

f. the fact that the Policies were or were not life insurance or that Plaintiffs' or Class Members' objectives (and/or the fact that the purchaser's goals) would be funded by the cash values and/or benefits derived from a life insurance policy or that the product being sold was life insurance was minimized or disguised;

g. whether the Policy or Policies were, would operate or could function as an Investment Plan;

h. the relationship between the Policy's or Policies' cash surrender value and the cumulative amount of premiums paid;

i. the fact that a part of the premiums paid would not be credited toward an investment or savings account or the Policy's or Policies' cash accumulation value, but would be used to offset the Defendants' commission, sales, administration, tax and/or mortality expenses;

j. the rate of return on premiums paid in terms of cash value or cash surrender value;

k. the relative suitability or appropriateness of the Policy or Policies;

l. the use of an existing policy's (or Policy's) cash value or cash-surrender value by means of a surrender, withdrawal/partial surrender or loan to purchase or maintain a new Policy or other life insurance policy;

m. the replacement or rollover of an existing life insurance policy or Policy with or into a new life insurance policy or Policy;

n. the Defendants' dividend, account value, interest crediting and cost of insurance and administrative charge policies and practices; policy or premium charges and monthly deductions; illustrations of interest crediting rates, account equity rates, account value calculations, policy charges, premium charges, monthly deductions, cost of insurance and administrative charges, cash values or death benefits; or any other matters relating to dividends, interest crediting rates, account equity rates, account value calculations, policy charges, premium charges, monthly deductions or cost of insurance and administrative charges;

o. the operation, administration, appropriateness and/or performance of mutual funds or annuities that were purchased from proceeds of a Policy; and/or

3. any or all acts, omissions, facts, matters, transactions, occurrences or oral or written statements or representations in connection with or directly or indirectly relating to the Settlement Agreement or the settlement of the Action, except as provided in paragraph II.E below.

B. Nothing in this Release shall be deemed to alter (i) a Class Member's contractual rights (except to the extent that such rights are altered or affected by the election and award of benefits under the Settlement Agreement) to make a claim for benefits that will become payable in the future pursuant to the express terms of the policy form issued by the Defendants or (ii) a Class Member's right to assert any claim which arises in its entirety from facts and circumstances arising after the date on which notice of the settlement is first mailed to Class Members; *provided, however,* that this provision shall not entitle a Class Member to assert claims which relate to the allegations contained in the Action or to the matters described in paragraphs II.A.1 or II.A.2, above.

C. Without in any way limiting the scope of the Release, this Release covers, without limitation, any and all claims for attorneys' fees, costs or disbursements incurred by Lead Counsel or any other counsel representing Plaintiffs or Class Members, or by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement and/or the Released Transactions except to the extent otherwise specified in the Settlement Agreement.

D. Plaintiffs and Class Members expressly understand that principles of law such as Section 1542 of the Civil Code of the State of California provides that a general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor. To the extent that, notwithstanding the choice of law provisions in the Settlement Agreement, Cal-

ifornia or other law may be applicable, Plaintiffs and the Class Members hereby agree that the provisions of Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction which may be applicable herein, are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of this Release.

E. In connection with this Release, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true with respect to the matters released herein. Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any Action); *provided however,* that nothing in this Release, including paragraphs II.B and II.D, shall prevent a Class Member who discovers after the first mailing of notice of the settlement to Class Members facts that arise out of or relate to the administration or servicing of a Policy after its purchase (not including (*x*) the matters described above in paragraphs II.A.2.a through c and, (*y*) with respect to any limited premium payment-type claim, paragraph II. A.2.d)—and that could not have been known with the exercise of reasonable care as of the date when notice of the settlement is first mailed to Class Members—from submitting a claim based on such facts to the Alternative Dispute Resolution Process for resolution under Part VIII of Exhibit A to the Settlement Agreement.

F. Nothing in this Release shall preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein.

7. All Class Members who have not timely excluded themselves from the Class are hereby enjoined from filing, commencing, prosecuting, intervening in, or participating as class members in, any lawsuit in any jurisdiction based on or relating to the claims and causes of action, or the facts and circumstances relating thereto in this Action and/or the Released Transactions (as that term is defined in the Settlement Agreement); and all persons are hereby enjoined from filing, commencing or prosecuting a lawsuit as a class action on behalf of Class Members who have not timely excluded themselves (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) in any jurisdiction, based on or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this Action and/or the Released Transactions (as that term is defined in the Settlement Agreement and in paragraph 6 above).

8. Defendants may, in their discretion, require any Class Member to resolve through the ADR Process as described in the Settlement Agreement any claim that constitutes a Part VIII.A.ii(a) Claim (as defined in the Settlement Agreement). In addition, Class Members may require that the Company resolve a Part VIII.A.ii(b) Claim (as defined in the Settlement Agreement) through the ADR Process.

9. Nothing in this Final Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement, nor shall anything in this Final Order and Judgment preclude plaintiffs or Class Members from participating in the ADR Process described in the Settlement Agreement, provided they are entitled to participate in such Process by the terms of the Settlement Agreement.

10. The Court has jurisdiction to enter this Final Order and Judgment. Without in any way affecting the finality of this Final Order and Judgment, this Court hereby retains jurisdiction as to all matters relating to administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Order and Judgment, and for any other necessary purpose, including without limitation the provisions of paragraph 7 of this Order.

11. Neither this Final Order and Judgment nor the Settlement Agreement (nor any

**78**

document referred to herein or any action taken to carry out this Final Order and Judgment) is, may be construed as, or may be used as an admission or concession by or against defendants of the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever. Entering into or carrying out the Settlement Agreement (including the exhibits therein), and any negotiations or proceedings related therein shall not in any event be construed as, or deemed to be evidence of, an admission or concession with regard to the denials or defenses by any of the defendants and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever other than as evidence of the settlement or to enforce the provisions of this Final Order and Judgment and the Settlement Agreement; *provided however*, that this Final Order and Judgment and the Settlement Agreement (including the exhibits therein) may be filed in any action against or by the defendants or Releasees (as defined in the Amended Stipulation of Settlement) to support a defense of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

12. This action, including all individual claims and Class claims resolved herein, is hereby dismissed on the merits and with prejudice against the plaintiffs and all other Class Members, without fees or costs to any party except as provided in the Memorandum and Order Awarding Attorneys' Fees.

IT IS SO ORDERED.