Jerry D. GROVE, Leo Wallace, Sidney C. Gilbert, and James A. Sender, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY,**
Defendant.

No. 4–97–CV–90224.

United States District Court,
S.D. Iowa,
Central Division.

April 30, 2001.

**436**

Melvin I. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, John J. Stoia, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Roger T. Stetson, Belin, Lamson, McCormick, Zumback & Flynn, PC, Des Moines, IA, for plaintiffs.

Charles C. Platt, Leboeuf, Lamb, Greene & Macrae, New York City, Brian L. Campbell, Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, IA, for defendants.

## ORDER

PRATT, District Judge.

After four years of litigation, the parties in this case ask the Court to certify this action as a class action, and approve as fair, reasonable, and adequate their settlement agreement. Additionally, the Defendant seeks an order dismissing this lawsuit with prejudice and on the merits. Finally, counsel for the Plaintiffs seek approval of their attorneys' fee application. For the reasons explained below, the Court will certify the class and approve the parties' settlement agreement as fair, reasonable, and adequate. The class action complaint therefore will be dismissed with prejudice and on the merits. The unopposed attorney fee request will also be approved as requested.

This order begins with a background sketch of this litigation, summarizing the allegations raised in the lawsuit and the efforts by counsel to settle it. Next, the Court will highlight some of the features of the class relief made available to class members as a result of the settlement agreement. The Court will then summarize briefly why this class should be certified, referencing some, but not all, of the arguments raised by counsel. The Court will spend some time explaining its decision to appoint two experts in this case, the nature of their appointments, and why their input proved invaluable to the Court. Finally, the Court will address the fairness of the settlement, as well as make some additional findings. Paraphrasing Judge Catherine D. Perry, the Court has not attempted to discuss all the issues, and to the extent it has not done so, it is because the Court agrees with the positions taken by lead counsel and Defendant in their submissions. *See In re General American Life Ins. Co. Sales Practices Lithog.*, No. 4:97MD1179 CDP, slip op. at 2 (E.D.Mo. Dec. 19, 2000) (order certifying class action and approving settlement agreement).

### I. Background

This is a class action seeking damages for a fraudulent scheme and common course of

deceptive sales practices with respect to the sale of life insurance policies and annuities. The named Plaintiffs represent a class of approximately 960,000 former and current life insurance policy and annuity holders [1] of the Defendant Principal Life Insurance Company, formerly known as Principal Mutual Life Insurance Company (hereinafter "Principal," the "Company," or the "Defendant").[2] Approximately 70,000 class members are Iowans.

The Plaintiffs claim that Principal's sales agents deceived them into purchasing life insurance policies and or annuities through the use of false and misleading policy illustrations, marketing materials, and sales presentations. A more complete description of the underlying allegations is available at *Grove v. Principal Mut. Life Ins. Co.*, 14 F.Supp.2d 1101 (S.D.Iowa 1998) (order denying Defendant's motion to dismiss). *See also* Second Am. Class Action Compl. at 3–48 (Clerk's # 203) (providing portraits of the individually named class members along with more detailed allegations of the deceptive sales practices). Principal denies the wrongdoing alleged by plaintiffs and does not admit fault, wrongdoing, or liability in connection with the facts or claims that have been alleged against it in this action.

In the Autumn of 1999, counsel for the parties entered into preliminary discussions to explore a possible settlement of the action. During this time, Plaintiffs conducted extensive discovery, including review of approximately 455,000 pages of documents and 180 videos, disks and tapes produced by Principal, as well as deposing and interviewing eleven of defendant's current and former officers, employees and representatives. Plaintiffs' discovery also included review of thousands of pages of documents produced by third parties. Settlement negotiations were

on-going and continued through 1999 and into the fall of 2000.

Following these negotiations, the parties entered into a Stipulation of Settlement (variously referred to as "settlement agreement," "settlement," or "agreement"), dated November 14, 2000 through which the parties agreed upon a settlement of this action, subject to the approval by the Court as to the fairness, reasonableness, and adequacy of the settlement. By Order of November 30, 2000 this Court preliminarily certified the class for settlement purposes pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, approved the law firm of Milberg Weiss Bershad Hynes & Lerach LLP as lead counsel for the class, directed the issuance of class notice, and scheduled a fairness hearing.

On March 23, 2001, the Court held the fairness hearing. Counsel for the class and Principal gave presentations in support of approval of the settlement agreement. The Court also heard from one lawyer representing a group of seven objectors. The Court also identified one objector who gave a short statement in opposition to the proposed settlement.[3] The fairness hearing was the culmination of an enormous documentary and briefing effort; between November 30, 2000 and March 23, 2001, counsel for each side provided to the Court numerous affidavits, exhibits, briefs, and other materials setting forth the legal and factual basis in support of their agreement.

## II. Class relief

The settlement agreement outlines, among other things, the relief that will be made available to the class.[4] Under the agreement, class members who have not opted out of the class [5] can choose between at least two

---

1. About 85% of the class consists of insurance policy holders; annuity holders comprise the rest.

2. More precisely, the class consists of persons or entities who have or had an ownership interest in approximately 810,000 life insurance policies issued by Principal during the period January 1, 1982 through December 31, 1998, and approximately 152,000 annuity contracts issued by Principal during the period January 1, 1982 through June 30, 2000.

3. In all there were 41 class members who filed written objections as of the date of the fairness hearing.

4. Based on the Court's review, the agreement was the product of arm's-length negotiations.

5. As of March 19, 2001, holders of 5,406 class policies or annuities have opted out of the class, which is about 0.5% of the policies and annuities covered by the settlement agreement.

types of relief: the Claim Review Process ("CRP") or the Settlement Death Benefit ("SDB"). Class members whose insurance policies were in-force during the years 1992 through 1997 will also receive Interest Rate Enhancements Guarantee Relief ("IREG") irrespective of their CRP/SDB election.

## A. Claim review process

The centerpiece of the relief package negotiated by the parties is the CRP. Under the agreement, Principal has set aside $67.15 million in cash [6] to pay the claims of class members who elect to have a claim reviewed and who are successful at proving some measure of liability and damages. In the CRP, a claim evaluator selected entirely by Milberg Weiss will evaluate claims based on, in the Court's view, a fairly liberal and open-ended scoring rubric designed to afford individually tailored relief to policy and annuity contract owners.[7] For purposes of the CRP, the Defendants have waived all procedural and evidentiary objections, including: parol evidence, statute of limitations, and laches. The cost for administering and implementing the claim review process is borne entirely by Principal, separate and apart from the CRP fund. Principal is also separately financing a

support and outreach program designed to inform and educate class members about the settlement relief. This notice and outreach is costing Principal $4.6 million.

The award issued by the claim evaluator will not be appealable.[8] Any unused portions of the CRP fund will be distributed in the form of increased CRP and SDB awards. To the extent the value of the claims exceeds the $67.15 million cap, then the amount awarded to each successful claimant will be reduced proportionately. Less than 5% of class members are expected to elect CRP relief. Based on past experience in other capped fund cases, *see, e.g., In re Metropolitan Life Ins. Sales Practices Litigation,* No. 96–179, MDL No. 1091, slip op. (W.D.Penn. Dec. 28, 1999) ($690 million cap); *Manners v. American General Life Ins. Co.,* No. 3–98–0266, slip op. (M.D.Tenn. Aug. 10, 1999) ($38.7 million cap); *Garst v. The Franklin Life Ins. Co.,* No. 97–C–0074 S, slip op. (N.D. Ala. June 25, 1999) ($40 million cap); *In re Manufacturers Life Ins., Co. Premium Litig.,* MDL no. 1109, slip op. (S.D.Cal. Dec. 21, 1998) ($50 million cap), the Plaintiffs predict that the CRP fund of $67.15 million will be sufficient to pay out all

6. Initially, Principal had set aside $64 million for the CRP fund. However, due to an oversight, Principal discovered that an additional 1,478 life insurance policies were mistakenly left out of the class. After factoring these policies into the class, Principal agreed to increase the CRP relief fund by $3.15 million. Therefore the total CRP fund is $67.15 million.

7. Claims are scored a 3, 2, 1, or are designated "contradicted." Claims are given a score of 3 if there is documentation of a misrepresentation; or the information, considered as a whole, clearly and convincingly indicates the claim is valid; or there is evidence of an agent's admission of a misrepresentation; or, in the discretion of the claim evaluator, a claim deserves such a score. Claimants receiving a score of 3 receive a compensatory cash award. Thus, a "performance claim" that receives a 3 would receive a cash payment equal to the amount that would be necessary for the policy or annuity to perform as originally represented or illustrated by the agent.

Claims are scored a 2 if a score of 3 is unwarranted, and the claim is supported by the weight of the evidence in the judgment of the evaluator; or in the judgment of the evaluator, the information neither supports nor contradicts the claim and the applicant did not receive certain disclo

sures; or, in the discretion of the claim evaluator, a claim deserves such a score. Claimants that score a 2 receive a cash award that equals 65% of a comparable claim 3 award.

A claim is scored a 1 if information in the file neither supports nor undermines the claim. A claimant who scores a 1 receives the SDB.

Claims are designated "contradicted" if they are contradicted by documentation or, if in the discretion of the claim evaluator, the claim deserves such a designation. Unless a claimant qualifies for IREG, no relief is available to contradicted claims.

8. This format, whereby claim evaluators are selected by class counsel and issue a single, unappealable award, contrasts with older, more cumbersome, claim review models, as in the *Prudential* case. *See In re Prudential Ins. Co. of America Sales Practices Litig.,* 962 F.Supp. 450, 488–89 (D.N.J.1997)(claim evaluation process involved a comprehensive multi-tier review system with internal appeal procedures), *aff'd,* 148 F.3d 283 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890 (1999). At the fairness hearing, counsel for the class, John Stoia, stated that the claim review model used in the *Prudential* case substantially prolonged the claims process, and delayed the payment of cash awards to the class members.

the successful claims submitted by class members electing CRP relief.

## B. Settlement death benefit

By default, class members who do not elect CRP relief receive the SDB. Under the SDB, class members receive free term life insurance coverage for a period of three to six years. The amount of the death benefit that Principal will pay depends on: whether a policy or annuity is involved; the face amount of the policy or, in the case of an annuity, the amount in premiums paid; and the age of the contract holder. In general, younger class members with high insurance coverage or high premium-paid amounts receive greater SDB coverage than older class members with less insurance coverage or low premium-paid amounts.

By way of example, and based on the tables set forth in the settlement agreement, the extent of SDB protection for class members with a $50,000 life insurance policy would be the following:

| Age in years | Length of coverage [9] | Amount of death benefit |
| --- | --- | --- |
| 0–29 | 6 years | $5,500 (or 11% of face amount) |
| 30–39 | 4 years | $4,000 (or 8% of face amount) |
| 40–49 | 4 years | $2,500 (or 5% of face amount) |
| 50–59 | 3 years | $1,875 (or 3.75% of face amount) |
| 60 and up | 3 years | $1,375 (or 2.75% of face amount) |

By contrast, the extent of SDB protection provided to annuity holders who have paid $50,000 in premiums is less than that which a policy holder would receive. Under this scenario, the SDB benefit for annuity holders breaks down into following:

| Age in years | Length of coverage [10] | Amount of death benefit |
| --- | --- | --- |
| 0–29 | 6 years | $2,500 (or 5.00% of face amount) |
| 30–39 | 5 years | $1,875 (or 3.75% of face amount) |

9. Under the terms of the agreement, SDB coverage for policy holders begins on December 31, 1999.

| 40–49 | 5 years | $1,125 (or 2.25% of face amount) |
| --- | --- | --- |
| 50–59 | 4 years | $ 875 (or 1.75% of face amount) |
| 60 and up | 3 years | $ 575 (or 1.15% of face amount) |

The parties represent, through their actuarial experts, that the SDB has a present value to the class of $136.3 million, based on the cost of purchasing similar insurance in the open market. Plaintiffs' counsel represents that the SDB addresses the harm experienced by class members, including: loss in policy values and death benefits; and loss in insurance benefits on deferred annuities.

## C. Interest rate enhancements guarantee

The final component of the class relief negotiated by the parties is the IREG. The IREG is an enhancement to the credited interest rate factors used to calculate the dividend on all Principal life insurance policies that were in-force during the years 1992 through 1997, plus an interest rate factor enhancement applied to new premiums received by Principal after 1997 on all affected policies. IREG will reach approximately 400,000 policies. Eligible class members will automatically receive IREG relief whether they elect the CRP or the SDB. Under IREG, because the interest rate factors will be automatically adjusted upwards, the value of the average class member's in-force policy will increase, regardless of market conditions. In effect, these enhancements will ensure that all policies sold during the 1992–1997 time period that remained in force will receive a higher dividend that they otherwise would. In other words, the interest rate enhancements will increase the values provided on a policy so that policy performance matches the representations that sales agents originally made to consumers.

Overall, IREG relief will increase the credited interest rate on affected policies by about 0.583% annually. This adjustment will increase future policy dividends by approxi-

10. Under the terms of the agreement, SDB coverage for annuity holders begins on June 30, 2000.

mately 2%, translating to about $500 per eligible class policy on a present value basis taken over the life of the policy. This amount will vary by policy holder. IREG will be worth more to class members who hold on longer to their policies. The IREG relief is estimated to have a present value of $175.7 million as of June 30, 1998. These enhancements are specifically tailored to address one of the Plaintiffs' primary claims, namely that Principal manipulated credited interest rates, and therefore the dividends paid, to the detriment of policy holders.

### III. Motion for class certification

Because the requirements of Rule 23(a) and 23(b)(3) are met, the Court finds that this action can be maintained as a class action.

#### A. Rule 23(a) requirements

■ Under Rule 23(a), the prerequisites to a class action are: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

As to numerosity, that requirement is certainly met as there are over 900,000 policies and annuities at issue here. Likewise, with no fewer than 20 common factual and legal issues raised by the Plaintiffs' claims, *see* Second Am. Class Action Compl. at para. 139 (listing the common allegations), the Court finds that commonality is met. *See In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 310 n. 47 (3d Cir.1998) (commonality met on substantially similar allegations), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). As to typicality, the Court finds the claims of the named Plaintiffs reflect the claims raised collectively by the class members as a whole. Thus, the typicality requirement is met. *See*

*id.* at 311 ("even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct") (bracket and some quotations omitted). As to adequacy, the inquiry of Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).[11] On the Court's review, there are no conflicts or antagonisms between the named and un-named Plaintiffs. Unlike mass personal injury cases in which differences in the nature and extent of damages among class members can be extreme, *see, e.g., Amchem, supra,* (interests of exposure-only plaintiffs and exposure-plus-visible-injury plaintiffs were not adequately accounted for in class certification and settlement), this is a case in which all class members share common grievances against the company and allege similar financial losses. The Court finds that the adequacy requirement is met.

#### B. Rule 23(b)(3) requirements

The Court further finds that the requirements of Rule 23(b)(3) are satisfied. That provision permits class certification where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for a fair and efficient adjudication of the controversy." The Rule 23(b)(3) analysis thus boils down to the "predominance" and "superiority" inquiries.

##### 1. Predominance

■ *Amchem,* in dicta, observed that predominance "is a test readily met in certain cases alleging consumer ... fraud[.]" *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. That observation is validated on the facts in this case. Here, the Court is confronted with a

---

11. The adequacy requirement also "factors in competency and conflicts of class counsel." *Amchem,* 521 U.S. at 626 n. 20, 117 S.Ct. 2231 (citation omitted). In this case, the class was ably represented by the legal team from Milberg Weiss Bershad Hynes & Lerach LLP and local counsel from the law firm of Belin Lamson McCormick Zumbach Flynn, PC. The Court can identify no conflicts growing out of their representation in this case.

class of readily identifiable consumers allegedly defrauded over a nearly 20–year period of time by Principal's sales agents using the same or similar deceptive sales techniques. Unlike the asbestos plaintiffs in *Amchem,* the money damages sought in this case are subject to objective quantification, calculable through standardized formulas. Class members do not have to fear, as some did in *Amchem,* that financial recovery by one group of Plaintiffs will be to the detriment of others in the class.

### 2. *Superiority*

█ Rule 23 provides a list of factors pertinent to the "superiority" analysis. These factors are:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum[.]

Fed.R.Civ.P. 23(b)(3)(A)–(C).[12] After examining these factors, the Court finds that a class action is superior to other available methods for the resolution of this controversy. Absent class certification, very few Plaintiffs would have the incentive or financial resources to press individual claims against Principal. Which is not to say that such litigation has not successfully occurred. It has, but only infrequently. *See* Richard T. Phillips, *The Trial of Individual Life Insurance Deceptive Sales Practices Cases,* 2000 A.L.I.–A.B.A. Continuing Legal Ed. 77 at 80 (Westlaw citation at SF50 ALI ABA 77) (hereinafter *Deceptive Sales Practices Cases*)(collecting deceptive sales practice cases tried to verdict: *Gallant v. Prudential Ins. Co. of America,* CV–93–50 (Cir. Ct. Barbour Co., Ala.)($25.43 million combined compensatory and punitive damage award); *Key v. Prudential,* CV–93–479 (Cir. Ct. Mar-

shall Co., Ala.) ($25 million jury verdict); *Cartwright v. Equitable,* 276 Mont. 1, 914 P.2d 976 (1996) ($6,127,845 jury verdict against company reinstated by State Supreme Court); *Haggan v. Jackson Nat'l Life Ins. Co.,* No. 96–0295 (Cir. Ct. Copiah County, Miss.) (jury returned $32.5 million punitive damage and $22,000 compensatory damage award)). As a practical matter, if this case is not certified, the nearly one million members of this class will not sue Principal. These people will claim no relief. Thus, this class action as presently constituted, and the negotiated relief provided by the settlement agreement, represents a superior means to resolving the claims in this case. Of course, to the extent one chooses to sue Principal individually, he or she can opt out of a Rule 23(b)(3) class action and proceed with individual litigation.

The Court notes there is no outstanding litigation that would undermine certification of this class. Lead counsel for the class does state, however, that a class action lawsuit has been filed in Alabama State Court on behalf of Alabama residents, but that case will be voluntarily dismissed once the settlement agreement in this case is approved. Finally, as to the appropriateness of concentrating this case here, the Court finds that the Southern District of Iowa is an appropriate forum given that Principal's corporate headquarters are located here, as well as many of the witnesses and documents.

### IV. Necessity of court-appointed experts

█ In addition to ensuring the requirements of Rule 23 certification are met, one of the Court's central obligations is to determine whether this settlement is fair, reasonable, and adequate. *See In re Prudential,* 148 F.3d at 316 ("Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims.") (citation omitted). The Court's oversight

---

**12.** Rule 23 lists an additional factor, namely, "the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3)(D). However, in settlement classes such as this one, this factor is deemed irrelevant. *See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 ("Con-

fronted with a request for settlement—only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed.Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

duty is fiduciary in nature. *See Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) ("Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate."). This task, which the Court undertakes at Part V of this Order, is not taken lightly as a substantial number of individuals, if the settlement is approved, will be deemed to have surrendered once and for all their rights for individual redress against the Defendant. *See* 2 *Newberg on Class Actions* (3d ed.1992) § 11.41 (Rule 23(e) requires courts to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished") (citation omitted). As the Supreme Court observed, class actions poised for settlement "demand undiluted, even heightened, attention" from the district court. *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231; *see also Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 849, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (discussing judicial scrutiny in a mandatory settlement class context). Where, as here, the parties seek certification and settlement approval simultaneously, the Court is required "to be even more scrupulous than usual" when examining the fairness of the proposed settlement. *In re Prudential,* 148 F.3d at 317 (citation omitted); *see also Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 68 (D.Mass. 1997)(court "has an obligation to consider the substantive fairness of the relief made available to settling class members, and this presumption [of fairness that exists with arms-length agreements] will not stand if the court determines that the substance of the agreement is not in fact fair and adequate").

The mandate that the Court give its "undiluted" and "heightened" attention in the judicial approval process is easier said than done. In its efforts to meaningfully effectuate this mandate, the Court confronted two central problems which led, in part, to the appointment of its own experts. First, as the preceding summary of the settlement relief suggests, and as the parties both admit, this case embraced a number of complex subject areas, including: individual deferred annuity contracts; cash value life insurance products; and a range of complex actuarial methodologies, accounting practices, and financial theories. Based on their papers and submissions, the parties clearly had superior knowledge of these underlying insurance and actuarial issues, as would be expected. *See United States v. Samuels,* 808 F.2d 1298, 1301 (8th Cir.1987) ("[c]ounsel almost always know a great deal more about their cases than [the court]." (Arnold, J., concurring in the denial of rehearing en banc)).

However, it would have been an abdication of the Court's role in the settlement process to blindly approve of an agreement, the basis of which it knew little about. By the time the Court preliminarily certified this case as a class action on November 30, 2000, it was clear that the Court lacked the necessary expertise and understanding to make an informed evaluation of the settlement.

In addition to a lack of technical expertise, a second difficulty encountered with the settlement process in this case was the lack of an adversarial presentation of the issues. In the papers filed by the parties in support of the settlement, the Court effectively received one side of the story. Armed with the testimony of scholars and financial experts, the parties advanced strong arguments as to the fairness, reasonableness, and adequacy of the settlement agreement, as well as the propriety of the attorney fee award. Missing was an independent critique of the agreement, or someone to play the devil's advocate. For example, Plaintiffs' experts on certification and fairness, *see,* e.g., Decl. of Dean John E. Sexton; Decl. of Professor Samuel Issacharoff, never had to contend with forceful viewpoints going the other way. As Judge Becker wrote in the *General Motors* case: "Because the issue of certification is never actively contested, the judge never receives the benefit of the adversarial process that provides the information needed to review propriety of the class and the adequacy of settlement." *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liab. Litig.,* 55 F.3d 768, 789 (3d Cir.), *cert.*

*denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

Testimony on the propriety of the fee award offers another example. An important conclusion reached by Professor Gregory Sisk, the Plaintiffs' expert on fees, is that the requested attorney fee award of $37.5 million is fair and reasonable. This conclusion, however, is based on the premise that the net settlement is "conservatively valued" at more than $375 million, a value Prof. Sisk expressly has taken on faith. *See* Decl. of Prof. Gregory C. Sisk at 12 ("[I] pretend no expertise regarding life insurance or actuarial analysis and thus *have not attempted any independent evaluation [of the settlement agreement.]*") (emphasis added). Without a countervailing assessment regarding the value of the settlement, Professor Sisk's declaration on fees remained a self-serving and largely unhelpful document. *See Ortiz,* 527 U.S. at 848–49, 119 S.Ct. 2295 (district court chastised for its "uncritical adoption" of the parties' representations concerning the settlement fund amount). The testimony on fees made better sense only after settlement values could be verified.

Granted, in settlement, differences get resolved. And on the eve of this settlement's final approval, few would expect to see evidence of the adversarial process. *See* Deborah R. Hensler et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain* 88 (2000) (hereinafter *"Class Action Dilemmas"*)(a class action that "settles before trial has, by definition, not been the subject of a full-fledged, comprehensive evidentiary hearing involving fact and expert witnesses, cross-examination, and documentary evidence"). Judge Weinstein described a similar phenomenon in the context of fairness hearings. He wrote that such hearings "are often carefully orchestrated by the parties, who are no longer adversarial but are now joined in support of a proposed settlement, to display the best aspects of their agreement." Jack B. Weinstein and Karin S. Schwartz, "Notes from the Cave: Some Problems of Judges in Dealing with Class Action Settlements," 163 F.R.D. 369, 382–83 (1995). It bears repeating that while the terms and structure of a class settlement may be controlled by private agreement, the Court carries, by virtue of Rule 23, the added obligation to ensure the settlement's substantive fairness, *see Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689; *Ortiz,* 527 U.S. at 849, 119 S.Ct. 2295; and its review cannot be "perfunctory." *Manual for Complex Litigation* (3d ed.1995) § 30.42; *see also* 2 *Newberg on Class Actions* § 11.41 (3d ed.1992) ("it is clear that the court should not give rubber-stamp approval"). Thus, it is the Court's belief that to the extent it rubber-stamps an agreement without some independent basis upon which it can judge for itself the substantive fairness of the agreement, the Court departs from its role—as mandated by the Supreme Court and envisioned by the drafters of Rule 23—as the ultimate guardian of unnamed class members.

Whatever virtues attach to the settlement of cases in our civil justice system, it was clear that the settlement of this class action did not neatly lend itself to the most balanced and critical presentation of the issues. Thus, for the Court to have had any meaningful role in the approval of this substantively complex agreement, experts chosen by the Court were needed to provide their independent input. And with that input, the Court was in a much better position to assess the arguments of the parties regarding the substance of their final agreement.

To this end, and by Orders dated February 7, 2001 and February 20, 2001 respectively, the Court hired Michael Murray, a professor of insurance at Drake University, and David Fishbaum, an actuary with MMC Enterprise Risk Consulting, Inc., to advise and educate the Court on the various insurance and actuarial issues presented by this case. These experts were hired, on the Court's motion, pursuant to Rule 706 of the Federal Rules of Evidence.[13] Such authority also

---

**13.** In relevant part, Rule 706 provides:

(a) **Appointment.** The court may on its own motion ... enter an order to show cause why expert witnesses should not be appointed[.] The court may appoint ... expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with

inhered in the Court's Rule 23 oversight power.[14]

Professor Murray provided to the Court in writing his comments and questions concerning the proposed settlement agreement. He was provided with copies of the parties' major filings, and commented extensively on them. Much of what he wrote supported the agreement, and some of what he wrote did not. His comments, copies of which were circulated to counsel, sharpened the Court's understanding of the issues, and helped the Court focus its questioning during the fairness hearing. Prof. Murray did not testify at the hearing. The parties elected not to cross-examine him. In short, his input gave the Court additional information upon which to assess the settlement's fairness.

Likewise, Mr. Fishbaum, as the financial expert, provided the Court much-needed actuarial input. Most significantly, he was able to give the Court an unbiased, independent valuation of the settlement which more or less corroborated the values tendered by the parties. Importantly, he was able to explain to the Court, in lay terms, the sophisticated actuarial analysis performed by Principal's actuary. *See* Milliman & Robertson, Inc., *Analysis of Benefits Made Available by the Proposed Settlement in* [Grove v. Principal], Feb. 8, 2001 (docketed Feb. 13, 2001). Because there was basic agreement as to the net value of the settlement, the Court did not

require Mr. Fishbaum to submit a written report of his findings. Nor was he asked to give testimony at the fairness hearing. Mr. Fishbaum provided a critical check to the parties' representations concerning the total value of the settlement agreement, and in so doing, lent credibility to the Plaintiffs' arguments on fairness and fees.

The Court also notes that given the significant Iowa interest in this case—some 70,000 policy and/or annuity holders are from Iowa—the Court solicited the help of the Iowa Attorney Generals Office ("IAGO"). The IAGO appeared in this case formally as a party in intervention, and, in the finest tradition of public service, committed its substantial time and expertise to this case. Among other things, the IAGO, on behalf of the Court and its experts, requested and reviewed documents and other discovery material from the parties; held status conferences with the experts; and otherwise assisted the Court in making the most efficient use of its time on the case.

█ In the end, hiring court-appointed experts was a natural choice when faced with the dilemma of approving a complex settlement agreement that was the byproduct of negotiations between self-interested parties. Since "the expense mechanism under Rule 706(b)" is "essentially an equitable procedure," *U.S. Marshals Service v. Means,* 741 F.2d 1053, 1058–59 (8th Cir.1984), the Court

the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.
**(b) Compensation.** Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow.... In other civil actions and proceedings [besides fifth amendment takings claims] the compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs.

**14.** *See* Fed.R.Civ.P. 23(d) and advisory committee cmt. thereto (setting forth a non-exhaustive list of procedural orders a district court can enter to ensure the fair and efficient conduct of

the action); *see also Manual for Complex Litigation* (3d ed.1995) § 30 (in aid of its responsibility to protect the interests of class members, "Rule 23(d) gives the court broad administrative powers"); *see also Ortiz,* 527 U.S. at 853, 119 S.Ct. 2295 (suggesting that the district court should have undertaken an "independent valuation" of the insurance assets, instead of relying on the value agreed to and represented by the parties); *Class Action Dilemmas* at 494 (suggesting that judges should seek assistance from "neutral experts" in evaluating the quality of settlements); *cf. Parker v. Anderson,* 667 F.2d 1204, 1208 (5th Cir.1982) (court of appeals spoke approvingly of the district judge's decision to appoint counsel for a subclass of objectors, with authority to conduct discovery into the propriety of the settlement negotiations and the fairness of the settlement); *In re Texas Prison Litig.,* 191 F.R.D. 164 (1999)(in response to concerns that class counsel were not adequately representing their interests, the court appointed separate counsel to represent objectors at the fairness hearing).

deems it fair to tax equally the costs of these experts to the Plaintiffs, through their counsel, and the Defendant.

## IV. Fairness of the settlement

 The criteria for determining. whether the settlement is fair, reasonable, and adequate are: (1) the possible rewards of continued litigation weighed against the benefits of settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *See generally Petrovic v. Amoco Oil Co.,* 200 F.3d 1140 (8th Cir.1999); *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171 (8th Cir.1995), *cert. denied sub nom. Crehan v. DeBoer,* 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996); *Van Horn v. Trickey,* 840 F.2d 604 (8th Cir.1988). In addition to these four criteria, the Court recognizes two additional, overarching principles. One, a settlement that is the product of arm's-length negotiations conducted by experienced counsel is presumed to be fair and reasonable. *See Manual for Complex Litigation* (3d ed.1997) § 30.42. And two, the Court "should not substitute [its] own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *See Petrovic,* 200 F.3d at 1148–49 (citation omitted). As the Supreme Court explained: "Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed.... The options available to the District Court [are:] accept[ ] the proposed settlement[,] reject [it] ... or ... try the case." *Evans v. Jeff D.,* 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986).

Having lived with this case actively for the last six months, read the voluminous submissions and filings by the parties, the relevant case law and secondary authorities, and most importantly having considered the point-of-view of neutral, third-party experts, the Court is satisfied that the settlement agreement presented by the parties in this case is fair, reasonable, and adequate.

### A. Rewards of litigation versus the benefits of settlement

Were this case tried successfully to verdict, the rewards could be substantial. *See Deceptive Sales Practices Cases, supra* (and jury awards cited therein). From what the Court has seen of the record, there appears to be a strong case on the merits. But as the parties point out, trying this case is fraught with danger. They could lose on the merits, *see, e.g.,* Br. in Supp. of Def.'s Mot. to Dismiss the Class Action Compl., attached as ex. A to Decl. of Charles C. Platt in Supp. of Class Action Settlement (making the case why all of Plaintiffs' legal claims fail on the merits); *Brown v. Royal Maccabees Life Ins. Co.,* 137 F.3d 1236 (10th Cir.1998) (summary judgment for company in insurance class action); *Gaidon v. Guardian Life Ins. Co. of America,* 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598 (N.Y.1999) (consolidation of two appeals; dismissing on the merits class claims asserting common law fraud). Even if successful at trial, they could lose on appeal. These risks and uncertainties were doubtless factors in the Plaintiffs' decision to settle this case, and others just like.[15] Although they may have entertained an interest in the earlier stages, Plaintiffs have no interest now in trying this case, and the Court obviously is without the authority to make them.

Although the Court can only speculate how this or the other cases would have fared had they been litigated, the Court ultimately

---

15. *See, e.g., Snell v. Allianz Life Ins. Co.,* No. 97–2784, 2000 WL 1336640, 2000 U.S. Dist. LEXIS 13611 (D.Minn. Sept. 8, 2000); *Bussie v. Allmerica Fin. Corp.,* 50 F.Supp.2d 59 (D.Mass.1999); *Elkins v. Equitable Life Ins. Co. of Iowa,* No. Civ. A96–296–Civ–T–17B, 1998 WL 133741 (M.D.Fla. Jan. 27, 1998); *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54 (D.Mass.1997); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 536 (D.N.J.1997), *aff'd,* 148

F.3d 283 (3d Cir.1998), cert. denied, 525 U.S. 1114, 119 S.Ct. 890 (1999); *Michels v. Phoenix Home Life Mut. Ins. Co.,* Index No. 5318–95, 1997 N.Y. Misc. Lexis 171 (Sup.Ct.N.Y. Jan. 3, 1997); *Willson v. New York Life Ins. Co.,* Index No. 94/127804, 1995 N.Y. Misc. Lexis 652 (Sup. Ct.N.Y. Nov. 8, 1995); *see also* Volume I of Plaintiffs' Compendium of Decisions (compiling additional cases).

446

agrees that the choice to settle is a reasonable one. It represents the safer, more certain, and probably less expensive route for the class. In this respect, the settlement strikes a reasonable balance between, on the one hand, the hypothetically significant but risky benefits of litigation, and on the other, the certain and immediate benefits of the class-wide relief. *See Manual for Complex Litigation* (3d ed.1995) § 30.42. ("In cases seeking primarily monetary relief, [the fairness review] entails a comparison of the amount of the proposed settlement with the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing.").

While not ideal, the benefits that flow from the decision to settle are not insignificant. The CRP allows class members to submit their claims before Plaintiff-friendly evaluators and to receive potentially full compensatory relief. The CRP fund is capped at $67.15 million, with any spill-over money reverting back to the class in the form of proportionally larger CRP and SDB awards. Practically speaking, history shows that only 5% of the class will take advantage of the CRP. The Court wished the claim rates were higher, but it is not the Court's role to force changes like that on the parties.

Those not electing CRP automatically receive the SDB with a fair market value of $136.3 million. Certain of the objectors question the appropriateness and value of this benefit to them as class members. For instance, they argue that the death coverage is relatively small and only realized if the insured should die during a narrow window of time of between 3 and 6 years. These objections are not without merit, and certainly if the SDB constituted the full extent of the relief provided under the settlement, the Court would be inclined to reject this agreement. However, in the end, the Court finds that the SDB, *as one of three varieties of relief available to class members*, represents a reasonable compromise. Principal is providing the SDB to class members free of charge and without any showing of liability or damages on their part. "The fact that some [class members] might have preferred more lucrative relief does not control th[e]

question. A settlement is, after all, not full relief but an acceptable compromise." *John Hancock*, 177 F.R.D. at 72.

Likewise, the Court finds the IREG to be a sensible remedy offered to class members. This band of relief addresses the allegations that Principal's employees fraudulently manipulated the interest rates on certain policies to the detriment of policy owners. As confirmed by the Court's own expert, the IREG represents a transfer of $175.7 million from Principal to all eligible policy holders. This is an immediate and direct benefit to the roughly 400,000 affected policy holders.

The Court's view of this agreement is not remarkably changed by the remaining factors, namely: Principal's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement.

**B. Defendant's financial condition**

As to financial condition, the Plaintiffs assert that Principal is a mid-sized life insurance company with the "wherewithal to mount the form of arduous defense that [its] papers predict." Pls.' Memo. In Supp. of Final Approval of Settlement at 28 (quoting *Allianz*, 2000 WL 1336640 *16, 2000 U.S. Dist. LEXIS 13611 at *53). No one doubts Principal's financial fitness to conduct a spirited defense. At the same time, given its enormous success over the past years in settling these cases, the Court is confident that lead counsel for the class would have the necessary resources to mount an equally zealous prosecution of this case on behalf of the class.

**C. Complexity and expense of litigation**

As before noted, the argument that litigating this case through trial would be complex, expensive, time-consuming, and risky is not without merit. On the other hand, these features inhere in varying degrees in almost every serious lawsuit. Settlement in this particular case represents a reasonable option under the circumstances, so the Court gives some weight to the complexity/expense/risk argument.

## D. Class response to the settlement

■ Finally, Plaintiffs argue that lack of negative feedback, measured by the low number of exclusion requests (about 0.5% of the covered policies and annuities [16]) and written objections (41 objecting class members) demonstrates "overwhelming" support for the settlement. Such a statistically insignificant response rate may signal approval of the settlement, and the Plaintiffs cite to cases saying so. *See* Pls.' Memo. in Supp. of Final Approval of Settlement at 30; Pls.' Supplemental Memo. and Resp. to Objections to the Settlement at 2–3. The Court, however, is unwilling to bootstrap a low response rate into class-wide enthusiasm for the settlement.

In this respect, the Court recalls Judge Yohn's finding in the *General Motors* case. In that case, Judge Yohn concluded that the "vast majority of the class members favor the settlement" because only an "infinitesimal number of truck owners [less than 0.25%] [had] either objected to or sought exclusion from the settlement." *In re General Motors Corp. Pickup Truck Fuel Tank Products Liab. Litig.*, 846 F.Supp. 330, 334 (E.D.Pa.1993). On appeal, the Third Circuit rejected that finding, offering a number of reasons why Judge Yohn's conclusion was unwarranted. *See General Motors*, 55 F.3d at 812–13. There may be many reasons why class members in this case didn't register their concerns about the settlement: lack of interest, time, information, etc. Like the Third Circuit in the *General Motors* case, the Court is unwilling to automatically equate class silence with a showing of "overwhelming" support for the settlement. Therefore, the fact that statistically few people bothered to opt-out or file an objection ultimately counts little in the Court's overall fairness analysis.

In the end, the Court is convinced the settlement is substantively fair and reasonable. It strikes a sensible balance between, on the one hand, an uncertain fate if litigation continues, and on the other, fairly calculable and substantial, though less then ideal, benefits that will quickly inure to the class under the terms of the agreement.

## V. Other findings

For the reasons as substantially expressed in the Plaintiffs' brief, *see* Pls.' Supplemental Memo. and Resp. to Objections to the Settlement (Clerk's # 250), the Court hereby overrules the objections to the proposed settlement.

On the basis of the "percentage of the fund" theory as outlined and explained in their brief, *see* Pls.' Application for an Award of Fees and Expenses at 5–21 (Clerk's # 241), the Court awards and approves as fair and reasonable an award of fees and expense in the total amount of $37,500,000.00.

Regarding compensation for the Court's appointed experts, the Court has read their application for fees and expenses. Professor Murray has submitted an itemized bill in the amount of $22,896. Mr. Fishbaum has submitted a similar bill in the amount of $43,992.25. Pursuant to Rule 706 of the Federal Rules of Evidence, the Court finds these amounts to be fair and reasonable compensation. Accordingly, the Court taxes half the costs to Plaintiffs, through their counsel, and half to Defendant.

## VI. Conclusion

Based on the foregoing, the Court enters the following Order:

1. The requirements of Rule 23 are met and this case is hereby certified, for settlement purposes, as a class action;

2. The settlement agreement is fair, reasonable, and adequate;

3. The lawsuit is dismissed with prejudice and on the merits;

4. Plaintiffs application for fees and expenses in the amount of $37.5 million is approved;

5. Michael Murray's application for fees and expenses in the amount of $22,896.00 is approved, with such costs taxed half to Plaintiffs, through their counsel, and half to the Defendant;

---

16. As of March 19, 2001, 5,406 class policies or annuities had been excluded from the class. This figure is roughly 0.5% of the class pool.

6. David Fishbaum's application for fees and expenses in the amount of $43,992.25 is approved, with such costs taxed half to Plaintiffs, through their counsel, and half to the Defendant.

7. The Court hereby incorporates into this Order exhibit G ("Final Judgment" and "Order Approving Class Action Settlement") appended to the Stipulation of Settlement.

**IT IS SO ORDERED.**